# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 2, 2011 Session

## STATE OF TENNESSEE v. HENRY LEE JONES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 0306997     John P. Colton, Jr., Judge**

-------------------

**No. W2009-01655-CCA-R3-DD  - Filed April 18, 2013**

-------------------

Appellant, Henry Lee Jones, appeals from his convictions of two counts of premeditated first degree murder and two counts of felony murder and his sentences of death resulting from the August 2003 deaths of Clarence and Lillian James.  At the conclusion of the penalty phase, the jury unanimously found the presence of four statutory aggravating circumstances relating to the murder of Mrs. James:  (1) Appellant was previously convicted of two or more felonies involving the use of violence; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of Appellant or another; and (4) the murder was knowingly committed while Appellant had a substantial role in committing any robbery.  *See* T.C.A. § 39-13-204(i)(2), (5), (6), (7).  The jury unanimously found the presence of the same four statutory aggravating circumstances with regard to the murder of Mr. James, as well as an additional statutory aggravating circumstance, that the victim was 70 years of age or older. *See id*. at (i)(14).  The jury determined that these aggravating circumstances outweighed any mitigating circumstances and imposed sentences of death.  On appeal, the following issues are presented for our review:  (1) whether the trial court erred in admitting evidence of a subsequent murder; (2) whether the evidence is sufficient to support the convictions; (3) whether the trial court erred in admitting photographs of the victims; and (4) whether Tennessee's sentencing statute for first degree murder is unconstitutional.  After a review of the record and the applicable law, we affirm Appellant's convictions and sentences of death and remand this matter to the trial court for entry of a single judgment of conviction for first degree murder with regard to each victim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined and CAMILLE R. MCMULLEN, J., concurring in part and dissenting in part.

Robert L. Parris and Jake Erwin, Memphis, Tennessee, for the appellant, Henry Lee Jones.

Robert E. Cooper, Jr. Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell and Thomas Henderson, Assistant District Attorney Generals, for the appellee, State of Tennessee.

## OPINION

## GUILT PHASE

Margaret Coleman, Mrs. James' daughter, testified the victims had been married for approximately seven years prior to their deaths. In August 2003, the victims were living at 2442 Bartlett Boulevard in Bartlett, Shelby County, Tennessee. Mrs. James was 68 years old and worked at Methodist Hospital. Mr. James was 82 years old and spent his mornings sitting in his garage and talking to people who passed by him.

Mrs. James' shift at the hospital was from 5:30 p.m. to 1:30 a.m. Because Mr. James had to stop driving following heart surgery, Mrs. James would take the bus to work, and Ms. Coleman or her brother would drive her home. When Ms. Coleman went to the hospital on Friday, August 22, 2003, to pick up Mrs. James, she was informed that Mrs. James did not come to work that day. She called the victims' house, but no one answered. Ms. Coleman said that there was a storm that night and that she believed the victims' telephone may have been affected by the storm. When Ms. Coleman called the next day and no one answered, she went to the victims' home.

Ms. Coleman testified that upon arriving at the victims' home, she saw that the garage door was down. She said this was unusual as the victims opened their garage door every morning and Mr. James would sit outside under the carport. Ms. Coleman walked to the backyard and called Mr. James' name. When no one answered, Ms. Coleman went to the front door. She described the front door as having a glass door with a wooden door behind it. The glass door was unlocked, and the wooden door was cracked open. Upon entering the residence, Ms. Coleman saw a pair of green scissors on the floor between the couch and the wall. She walked toward the dining room and kitchen calling the victims' names. Ms. Coleman saw a green spray bottle, a dish towel, and trash laying out, which she believed to be unusual as Mrs. James always maintained a clean house. She also saw that the linen closet was open and that linens were falling out of the closet and onto the floor. Ms. Coleman testified she knew something was wrong, so she took a cordless telephone from the den and ran outside. She called 911 and remained outside until the police arrived.

Ms. Coleman stated Mrs. James had jewelry that she wore daily and jewelry that she

wore to church. Mrs. James always wore a diamond pendant necklace, a diamond cluster ring, another diamond ring, a gold bracelet, and a watch. During trial, Ms. Coleman was shown rings and a photograph of rings that she identified as similar to those worn by Mrs. James.

Officer Phillip Devers of the Bartlett Police Department was the first officer to respond to the scene. Officer Devers testified that on August 23, 2002, at 3:30 p.m., he received a call to conduct a welfare check at 2442 Bartlett Boulevard. When he arrived, he spoke to Ms. Coleman and entered the residence.

Officer Devers testified that after entering the residence through the front door, he looked down the hallway to his left, he saw that the linen closet was open and that linens were pulled out of the closet and onto the floor. He looked inside a bedroom on the left side of the hallway and observed that a mattress was turned crossways over the box springs. The chest of drawers was open, and articles were removed and hanging from the drawers. Officer Devers then entered a sitting room and saw a few articles that appeared to be disturbed. He stated he entered the master bedroom and saw Mrs. James laying face down in a very large pool of blood. Officer Devers testified her head was almost completely cut off her body. He exited the room and contacted dispatch for assistance.

Officer Devers testified he left the residence and spoke to Ms. Coleman, who stated that both victims should be inside. By that time, Officer Robert Allen arrived on the scene, and both officers entered the residence. Officer Devers stated that they entered the formal dining room on their right and that he saw a lamp on the table with part of the electrical cord cut off of it. He entered the kitchen where he saw a large knife and the garage where he saw a vehicle. Officer Devers said he then opened the door to the utility room and saw Mr. James laying face down with his hands behind his back and his throat cut. The officer was unable to open the door far enough to allow him to enter the room because Mr. James' body was blocking the door.

Tervarus Young, an inmate at the Shelby County Correctional Center, testified that in August 2003, he left the residence that he was sharing with his girlfriend in Hollywood, Florida after an argument. He was homeless and slept in a park in Ft. Lauderdale. Mr. Young stated he woke up one morning to find Appellant standing in front of him. When Appellant asked him why he was there, Mr. Young informed him of the argument with his girlfriend. He said that Appellant offered him $20.00 for oral sex and that he agreed to the proposition because he needed the money.

Mr. Young recalled Appellant, driving a Dodge Aires K-car, first took him to McDonald's and purchased food for him. They then went to a lady's house where Appellant

made a telephone call. Appellant drove them to a pawn shop where Appellant pawned a necklace and retrieved a ring that he previously had pawned. Appellant drove to another pawn shop where he pawned that same ring. He told Mr. Young that he needed to pay some tickets, so they went to the courthouse in Miami, approximately twenty-five to thirty minutes away. As they were leaving the courthouse, Appellant's car ran out of gas. Mr. Young stated that Appellant refueled his car, he drove to a warehouse where Mr. Young performed oral sex on him and received $20.00.

Mr. Young testified that while at the warehouse, Appellant asked him whether he liked women and told him that he knew some women in Daytona. Mr. Young agreed to go with him to Daytona. Appellant first drove Mr. Young to his grandmother's residence to get clothes. They then traveled to Daytona where they met two women, "Toosie" and "Tawana." Mr. Young said he spent the night with Tawana while Appellant left with Toosie. Appellant and Toosie returned the next morning and were arguing. Appellant told Mr. Young that he was ready to leave, so Mr. Young left with him. Appellant also told Mr. Young that they were going to visit some of his relatives. Mr. Young stated Appellant was driving and that he did not know where they were going. Appellant drove all day and night, and Mr. Young slept during the majority of the ride.

Mr. Young recalled waking up at a Burger King that was attached to a gas station. A man came to the car asking for Appellant, who was not in the car. Mr. Young got out of the car, entered the gas station, and washed his face. When he came out of the restroom, he saw Appellant talking to the same man. Mr. Young sat at a table near them, and a woman brought them food and drinks. They remained at Burger King for approximately fifteen to twenty minutes.

Mr. Young testified Appellant then drove to an apartment complex and told him that they were "here." Appellant walked across the street, and Mr. Young followed him. When Mr. Young questioned Appellant as to why he parked his car at the apartment complex, Appellant replied that no one had said he could not park there. Appellant also asked Mr. Young why he was asking so many questions. They walked down the street and came to a house where an older man was sitting out front and the garage door was up. Appellant asked, "hey Pops, how are you doing?" The man stated he had just gotten out of the hospital where he had a pacemaker placed in his heart. Appellant asked the man why he was outside, and the man explained he was waiting on the man who mowed his yard. Mr. Young testified that he offered to mow the man's yard for free but that the man declined and asked him to take his lawn mower to the back yard. Mr. Young took the lawn mower to the back yard and put it inside a shed. He stopped to look at a bird bath and statutes that were in the back yard and to drink water from a faucet.

-4-

Mr. Young said that when he returned to the front yard, the garage door was closed, and no one was outside. He knocked on the front door, but no one came to the door. The door was unlocked, so Mr. Young entered the house. Mr. Young testified that as he walked inside, he saw Appellant walk around the corner holding bloody rags and a rope. He followed Appellant to the second room where he saw an older lady. He testified Appellant threw the woman on the floor and said, "old lady, old lady, you know what time it is?" Mr. Young said Appellant tied the woman's hands behind her back with a rope and demanded her purse. The woman told Appellant that her purse was in the other room. Appellant instructed Mr. Young to sit down, and Mr. Young complied, sitting in a chair next to the door. Mr. Young stated that while Appellant was gone from the room, the woman asked Mr. Young if they were going to kill her. Mr. Young told her that Appellant had said they were relatives, and the lady denied it.

Mr. Young testified Appellant returned to the room with a purse and told Mr. Young to stand up. When Mr. Young complied, Appellant emptied the contents of the purse in the chair. The woman told Appellant that she was expecting her son to arrive, and Appellant replied that if he did, he would "get the same thing you're going to get." Appellant then picked up the woman and pushed Mr. Young out of the way and into another room. Mr. Young said Appellant threw the woman on the floor and put a rope around the woman's neck. He stated Appellant put his foot on the back of the woman's neck and strangled her. Mr. Young testified Appellant then took out a knife from his side and cut the woman multiple times. When Mr. Young asked Appellant why he had killed the woman, Appellant replied that she had seen his face.

Mr. Young stated that Appellant left the room and that he heard cabinets "slamming." Appellant returned with a brown plastic bag and instructed Mr. Young to hold the bag. Appellant put the rope and rags inside the bag and instructed Mr. Young to follow him. They went into the laundry room where the older man was dead and lying in a puddle of blood. Mr. Young testified that the man was also bound and that Appellant removed the rope and put it in the bag. They then went into the bathroom where they ran water inside the bag. Appellant snatched the bag out of Mr. Young's hands and went into another room where he put a billfold and other items inside the bag. Mr. Young testified Appellant went room by room taking items, including a coin in the room where the woman was lying and the rings that she was wearing.

Mr. Young testified that after they left the house and returned to the vehicle, Appellant drove to a gas station. Appellant used a credit card from the billfold that he took from the house to pay for gas at the pump. After they left the gas station, Appellant threw cards and papers in the billfold out of the window. He gave Mr. Young $1,500.00 in cash and the rings that the woman was wearing. Appellant drove to a mall where they both purchased shoes at

Foot Locker and clothes from JCPenney. Appellant purchased a yellow Tommy Hilfiger long sleeve shirt, and they both paid for their items with cash. Mr. Young admitted he used the money that Appellant gave him to purchase his clothing. After leaving JCPenney, Appellant instructed Mr. Young to change his clothes and throw his old clothing out the window.

Mr. Young testified Appellant placed a hook bladed knife that he had used to kill the victims on the console between the two of them. Appellant told Mr. Young that he had the knife for a long time and instructed him to touch it. Mr. Young said that after he touched it, Appellant told him to swear that he would not tell anyone about the killings. Appellant warned Mr. Young "if you ever tell somebody what happened I'm going to kill you and cut your dick off."

Mr. Young said that while Appellant was driving, he passed a car dealership and turned the car around. Appellant purchased a Lincoln at the dealership. He gave the keys to the Dodge Aires to Mr. Young and instructed Mr. Young to follow him. They drove to a grocery store where Appellant purchased screws for the license tag. Appellant got a tag out of the trunk of the Dodge and put it on the Lincoln.

Mr. Young testified they drove for several hours and stopped for gas two or three times. Appellant paid for the gas at the pump using a credit card. They stopped at a rest stop where they purchased food and drinks. Mr. Young locked the doors of the Dodge and got into the Lincoln. He maintained that as he was about to fall asleep, Appellant forced himself on him and raped him. After leaving the rest stop, they next stopped to see Toosie and Tawana. Mr. Young was doing drugs, and Appellant and Toosie left. After Appellant returned, he and Mr. Young left driving south.

Mr. Young was stopped by an officer in Florida for speeding. He explained he had found the courage to attempt to flee from Appellant. He was flashing his lights at other vehicles and swerving in the lanes. The driver of one of the cars that he flashed his lights at was a police officer, who then pulled him over. Mr. Young told the officer that he did not have a license or registration and gave the officer a false name and social security number. Appellant then pulled up behind the officer and talked to him. Mr. Young was arrested due to an outstanding warrant. He admitted he had Mrs. James' rings on him when he was arrested.

Mr. Young testified that when the police first questioned him, he implicated Wesley Armstrong. He said he lied to the police because he was afraid. At the time of trial, Mr. Young was incarcerated and charged with two counts of facilitation of first degree murder. He denied receiving any threats or promises in exchange for his testimony at trial.

On cross-examination, Mr. Young testified he hoped to receive consideration for his testimony at trial. He admitted that the first time he was with Tawana, he was drinking alcohol and using marijuana and that he was hung over the next day. Mr. Young also admitted he first told the police officers that he did not enter the victims' residence but stayed in the car. He told the officers that Appellant and Mr. Armstrong went to the victims' residence. He also told officers that he had never left the state of Florida and that he was with a woman in Daytona. Mr. Young stated that when the officers returned the next day, he continued to lie to them but then told them the truth during the same interview. Mr. Young denied removing Mrs. James' clothes and did not see Appellant remove her clothes.

Diane Armstrong, Appellant's niece, testified that in the spring of 2003, she was living in Arlington, Tennessee, and was the assistant manager of a Burger King where her husband, Wesley Joseph Armstrong, was the general manager. During that time period, Appellant, and his girlfriend, Sherry, were living with the Armstrongs and working at Burger King. Appellant and his girlfriend moved out after almost a month and quit their jobs. Mrs. Armstrong still saw them on occasion at Burger King.

Mrs. Armstrong testified that in August 2003, Appellant visited her at her home. Appellant had been to Burger King looking for Mr. Armstrong, who was out running an errand. Mrs. Armstrong called Mr. Armstrong, who said for Appellant to return to Burger King and eat. Mrs. Armstrong said she walked Appellant to his car and saw a young African American man in the car.

Wesley Armstrong testified he saw Appellant's white Dodge outside of the Burger King and came outside to meet him. There was a man in the vehicle, who Mr. Armstrong did not know. He described the man as a skinny African American with braids in his hair. He gave food to Appellant and the other man. They then left, and Mr. Armstrong did not see them again.

Christopher Stallion, an employee with the City of Bartlett, testified that on August 22, 2003, at approximately 1:00 p.m., he drove by the victims' residence and saw Mr. James outside with two African American men. Mr. Stallion could not recall how tall the men were or what they were wearing. He admitted that he told police officers that one of the men was 6'1" tall and weighed 250 pounds. Mr. Stallion told officers that the other man was slim, was wearing a white shirt and blue pants, and had a "low" hair cut.

Michael Smith owned Auto Corral, a used car dealership in Batesville, Mississippi. Mr. Smith testified that on Friday, August 22, 2003, just prior to closing at 5:30 p.m., a man entered the business wanting to purchase a car. Mr. Smith described the man as African American with a tear drop tattoo on his face below his eye. Another man accompanied him,

but Mr. Smith did not have any contact with him. The man first spoke to Mr. Smith's father, and they decided on a car, a white 1993 Lincoln Towncar, and a price, $3,200. Mr. Smith completed the paperwork.

Mr. Smith testified that when it was time for the man to pay, he excused himself and went to the restroom where Mr. Smith could hear him counting the money out loud. When the man returned, he handed Mr. Smith the exact amount of cash. Mr. Smith said the man told him that the money was from a tax refund. At trial, Mr. Smith identified a bill of sale with the signatures of Mr. Smith and Appellant, a buyer's guide with Appellant's signature, and a privacy disclosure with the signatures of Mr. Smith and Appellant. Mr. Smith also obtained a copy of Appellant's license.

Mr. Smith said Appellant drove the Lincoln off the lot, and the other man drove the car in which they arrived. Appellant returned to the lot a week later to correct a problem with the title. Mr. Smith said Appellant told him that he had driven to the lot from Florida.

Detective Carlos Joseph Reyes of the Brevard County Sheriff's Department in Melbourne, Florida, testified regarding a traffic stop on Monday, August 25, 2003, at 1:00 p.m. Detective Reyes said he was driving on Interstate 95 to a meeting at the Palm Bay Police Department when he noticed a white Dodge Aires in his rear view mirror that was approaching at a high rate of speed and cutting off other vehicles. The car eventually pulled behind the detective's vehicle and began tailgating him. Detective Reyes was in an unmarked car, so he decided to warn the driver by flashing his blue lights. He said he drove a few more miles before the driver began exhibiting the same behavior, so he conducted a traffic stop.

Detective Reyes testified he informed the driver of the reason for the stop and asked him for his driver's license and other documents. The driver did not have a license and provided a name and date of birth. Detective Reyes ran the name the driver of the Dodge provided but did not receive any information. He said the driver was acting "very nervous," so he called for backup. The driver told the officer that he was following his stepfather, who was driving a white Lincoln Towncar. Detective Reyes recalled seeing the Lincoln pass him earlier.

Detective Reyes testified that during the traffic stop, the Lincoln pulled up behind him, and Appellant, who was driving the car, started to exit it. The detective instructed Appellant to remain in the vehicle for officer's safety. Appellant told the detective that he owned the Dodge. Appellant said that he met the driver through a friend and that he paid the driver to drive the car to Ft. Lauderdale for him. Appellant showed the detective his driver's license and documentation verifying he had just purchased the Lincoln. Detective Reyes'

backup arrived, and the detective asked the officer to run Appellant's name. Detective Reyes said that Appellant did not have any outstanding warrants and that his license was valid.

Detective Reyes testified that when he confronted the driver of the Dodge regarding the false name, the driver stated his name is Tervarus Young and provided his date of birth. The detective discovered Mr. Young had an outstanding warrant from Broward County and arrested him. Detective Reyes told Appellant that he would not have the Dodge towed but that Appellant needed to leave while the officers completed the paperwork. He instructed Appellant to return for the vehicle in twenty minutes. The detective testified Appellant did not return for the vehicle. He explained that if a vehicle is on the side of the road, the Florida Highway Patrol will put a red tag on it and have it towed after twenty-four or forty-eight hours.

Captain Tina Schaber testified that in August 2003, she was a lieutenant in the detective division of the Bartlett Police Department. She was called to the scene and arrived after the scene had been secured. Captain Schaber also drove Dr. O.C. Smith from the Shelby County Medical Examiner's Office and his assistant to the scene.

Captain Schaber said she entered the guest bathroom of the residence and observed that the sink and floor were wet and that some of the water was red. A large jewelry box with costume jewelry was on top of a dresser in the master bedroom. Captain Schaber observed a broken necklace with a diamond shaped pendant in the den. Boxes, a necklace, and a ring were on the bed of the first bedroom on the left. Captain Schaber recalled seeing a green and white towel with a brownish-red stain on the floor in front of the dining room table. She also observed a lamp in the dining room with an electrical cord that appeared to have been cut and a white or beige towel with brown stains. Captain Schaber directed detectives to collect evidence. She was unaware if valuable fingerprints other than those of the victims were recovered from the house.

Captain Schaber testified Mrs. James' credit card was first used at a Citgo gas station on Sycamore View, approximately two and one-half to three miles from the victims' house. She said that neighbors had identified James White as at the victims' residence and that the clerk at the gas station identified James White as the man who used the credit card. Captain Schaber investigated Mr. White, along with eight to ten initial suspects.

Detective Joseph Massey of the Bartlett Police Department testified he was called to the scene and prepared diagrams of the various rooms. Upon entering through the front door, Detective Massey observed an empty carton of Sprite on the floor. In the dining room, he observed a lamp on the corner of the table and that the cord had been either pulled off or cut. Detective Massey stated the part of the cord that was cut was never recovered. He noted a

-9-

rag with what appeared to be blood on the table next to the lamp and a rag with what appeared to be blood on the floor. In the den or living room area, he saw a pair of scissors on the floor, along with a plastic grocery bag. Detective Massey said that in the kitchen, he found paper towels on the dinner table and aluminum foil with a napkin, an aspirin container, and a Gatorade bottle on the countertop. A key in liquid, Mr. James' insurance card, and a knife were in the sink. Wire cables and wire were on the floor in front of the refrigerator.

Detective Massey testified that in the laundry room where Mr. James' body was found, he saw a square of linoleum in the entryway with what appeared to be blood on it, a blue day planner, a ceramic candle holder on the floor at Mr. James' mid section, and a broken vase at his feet. In the master bedroom where Mrs. James' body was found, Detective Massey saw a rag with what appeared to be blood on a small table, a piece of electrical cord that had been cut under Mrs. James' feet, a piece of duct tape on Mrs. James' right shoulder, and coin wrapper and a jewelry box on the bed. He also observed blood on the countertop of the guest bathroom.

On September 12, 2003, Detective Massey and Detective Johnny Lawson of Melbourne, Florida, interviewed Mr. Young at the Broward County Detention Facility in Fort Lauderdale. Detective Massey said he recognized Mr. Young from the surveillance video of the Citgo in Memphis. He explained Mr. Young had a unique hair style, which consisted of three to four inches of braids on the top of his head. Detective Lawson advised Mr. Young of his *Miranda* rights after which Mr. Young talked to them for four to five hours. Detective Massey described Mr. Young as emotional, crying uncontrollably and vomiting. The detective said that during parts of the interview, Mr. Young lied to the detectives but that he was truthful in other parts.

Detective Massey interviewed Mr. Young the next day at the same location. Mr. Young was again advised of his rights. Detective Massey testified there were some changes in Mr. Young's story from the first day and that he cried uncontrollably at times during the interview.

Detective Massey and another Bartlett police officer interviewed Mr. Young a third time on September 17, 2003, at the Broward County Investigative Office. Detective Massey said Mr. Young was more calm during this interview, but did cry at times. Mr. Young essentially told the officers the same story with some differences. The detective took some of Mr. Young's property, including rings that Ms. Coleman had identified at trial as similar to those worn by Mrs. James, and a Florida uniform traffic citation issued to Mr. Young.

James White testified that in 2002, he suffered a stroke and had to quit his job detailing cars at Chuck Hutton Chevrolet. Since then, Mr. White collected social security

disability and did yard work to supplement his income. Mr. White stated he did not cut the James' grass but cut their neighbor's grass. Mr. White recalled Mr. James would sit in his garage and wave and talk to people as they passed. He denied killing the victims. He stated he did not own a car in August 2003 and did not purchase gas.

Officer Rodney Askew, a Memphis police officer, testified he was called to the scene to assist in fingerprinting. He lifted prints off a flower vase, the refrigerator, two hanging pictures, frame glass, the garage door, and a vase on the refrigerator. The prints were examined by Officer Robert Winston, a latent print examiner with the Memphis Police Department. Officer Winston testified only three of the prints were of value. He compared the prints to those of Appellant and Mr. Young, and the results were negative.

Clay Barnett, an investigator in corporate security at First Tennessee Bank, testified he was asked to identify the holder of a credit card assigned to Lillian Wilson through First Tennessee Bank. Mr. Barnett stated the credit card was used on August 22, 2003, at 3:18 p.m. in Tennessee; August 22 at 7:56 p.m. in Mississippi; August 22 at 11:41 p.m. in Mississippi; August 23 at 2:21 a.m. in Mississippi; and August 24 in Florida. Each transaction was for the purchase of gas.

Detective Kevin Thompson of the Bartlett Police Department investigated financial crimes, fraud, forgery, and identity theft. He testified he went to the victims' residence to search for financial documents and found credit cards, including a First Tennessee Visa card in the name of Lillian V. Wilson. He was able to determine the cities where the credit card was used. The credit card was first used on August 22 at a Citgo gas station on Sycamore View in Memphis. The card was next used on August 22 in Batesville, Mississippi, and then in Madison, Mississippi. The card was used on August 23 in Gulfport, Mississippi, and on August 24 in Melbourne, Florida.

Timothy Smith, the general manager of the Shell Gas Mart in Batesville, Mississippi, in August 2003, testified he provided the Bartlett Police Department with a surveillance video from August 22, 2003. Kim Lenard, the assistant manager of a gas station in Madison, Mississippi, in August 2003, testified she provided the Bartlett Police Department with a surveillance video from August 22, as well as batches from credit card sales on that date. She found two transactions for the credit card number matching the credit card owned by Mrs. James.

Detective David Neyman of the Bartlett Police Department testified he retrieved the surveillance videos from Mr. Smith and Ms. Lenard. Detective Neyman said the video from the Shell Station in Batesville, Mississippi, showed a Dodge Aires K-car in the area of the gas pumps between 7:45 p.m. and 8:00 p.m. on August 22. He was unable to recognize the

driver of the car from the video. Detective Neyman stated the video from the gas station in Madison, Mississippi, showed an African American man wearing a light-colored baseball cap, a yellow shirt, and shorts exit a white Lincoln Continental at approximately 11:00 p.m. As the driver of the Lincoln was leaving, a Dodge Aries K-car immediately pulled out behind him on the roadway. Detective Neyman advised his supervisors of the vehicles and recommended that a "be-on-the-lookout" be placed for the white Lincoln and the Dodge Aires K-car.

Dr. Qadriyyah Debnam, a special agent forensic scientist in the DNA Serology Unit of the Tennessee Bureau of Investigation's crime laboratory in Memphis was admitted by the trial court as an expert in DNA analysis and interpretation. Bartlett police department submitted samples for analysis pertaining to the deaths of Mr. and Mrs. James. Dr. Debnam concluded that the following items had Mr. James' blood on them: a hand towel, a rag, and two samples from the laundry room floor. He concluded that the following items had Mrs. James' blood on them: two samples from the bathroom sink, a sample from the back of the sink, a sample from the bathroom floor, and a sample from the bedroom floor. He tested samples from the baseboard and wood in the bathroom and found that the DNA profile matched Mrs. James at ten of thirteen LOCI gender marker. The doctor tested another sample from the bedroom floor and found that the DNA profile matched Mrs. James at six of nine LOCI gender marker. Dr. Debnam tested fingernail clippings from Mr. and Mrs. James and found no DNA profile other than their own respective profiles. The DNA on a cup matched an unidentified female.

Antonio Jones testified that in the spring of 2003, he was employed as a service manager at the Deerfield Apartments located at Raleigh-LaGrange and Sycamore View in Shelby County. He met Appellant at the exercise room in the apartment complex. Mr. Jones stated Appellant jogged in Freeman Park located two to two and one-half miles from the apartment complex. Mr. Jones had discussed running with Appellant and saw Appellant on occasion leave the entrance of the apartment complex and run down Bartlett Boulevard and Sycamore View toward Freeman Park.

Dr. O'Brian Cleary Smith was the Medical Examiner for Shelby County in 2003 and was admitted by the trial court as an expert in forensic pathology. Dr. Smith went to the scene to examine the victims' bodies and later performed the autopsies on the victims. He stated Mr. James was eighty-two years old, was 5'9" tall, and weighed 137 pounds. He noted Mr. James had multiple injuries, including cervical spine fractures, rib fractures on both sides of his chest, a knife stab wound to the neck, multiple incised wounds to the neck, and injuries from ligature bondage.

Dr. Smith testified a knife can make several types of injuries. One such injury is a

stab wound where the blade of the knife enters the body deeper than other types of knife wounds, and the dimensions of the blade may be present on the outside. An incised wound is a slicing action where the knife enters the tissue of the body at a more shallow depth but creates a longer superficial cut. Dr. Smith found four incised wounds to Mr. James' neck, which were confluent or ran together. He also observed a stab wound to the right side of Mr. James' neck located in the middle of the incisions. He said the stab wound entered into the right side of the neck, into the voice box, and across the structure known as the epiglottis, which divides the "food pipe" from the "wind pipe."

Dr. Smith testified there were also injuries to the bones of Mr. James' neck, including the hyoid bone, which is the "U-shaped" bone covering the upper portion of the wind pipe just below the angle of the jaw. The doctor opined the hyoid bone was fractured by blunt force or "[i]n other words, it was pushed or struck in such a way that the bone had to break on that side." He explained the typical way that the hyoid bone can be fractured is through manual strangulation. He stated the bone can also fracture through strangulation with a ligature or a bar, but he did not see any evidence of the use of these instruments on Mr. James.

Dr. Smith stated that in cases of strangulation, it is not unusual for small hemorrhages to develop in the whites of the victim's eyes and along the skin surrounding the eyes. When the neck is sufficiently compressed, the circulation to the brain may not be cut off, but the pressure in the small blood vessels builds up and can rupture. Moreover, when a person becomes short of oxygen, the blood vessels are damaged and begin to leak blood. Dr. Smith testified Mr. James had petechial hemorrhaging in the whites of his eyes indicative of a force sufficient to compress the neck. On cross-examination, Dr. Smith acknowledged that petechial hemorrhages do not always indicate strangulation. The doctor also found triangular-shaped red marks in Mr. James' eyes that can occur when a person dies with his or her eyes slightly open.

Dr. Smith testified Mr. James' sixth cervical vertebra was fractured. He said the pattern of the fracture was consistent with compression of the neck and Mr. James' chin on his chest with enough flexion to cause the bones to squeeze together tight enough to cause a fracture on the lower front margin of the sixth cervical vertebra. This generally results when enough downward and forward pressure is applied on the neck to cause it to fracture.

Dr. Smith stated Mr. James' tongue had contusions or small bruises in an area approximately halfway back from the tip of his tongue to its base. The doctor noted there was hemorrhage associated with the incised wounds and the stab wound that went into the neck and came out on the other side of the tongue. The doctor said this type of bruise can occur when a person's teeth makes contact with his or her tongue.

Dr. Smith found evidence of ligatures on Mr. James. He testified there were ligature marks, or pattern bruises, and pressure marks on Mr. James' wrists, indicating that a cord-like material or narrow material had been tightly bound around Mr. James' wrists to leave an impression after the ligatures were removed. He noted postmortem incised wounds on Mr. James' wrists with red metallic material in one of the wounds. Dr. Smith said the incised wounds went across the ligature pressure marks and could have been caused by a knife. There were also two recent violet-colored bruises on Mr. James' shoulder. Finally, Dr. Smith found a surgical scar and wire evidence that Mr. James had undergone open heart surgery.

Dr. Smith testified the fractures of Mr. James' ribs were rather extensive with right ribs one, two, four, five, and six and left ribs two, three, four, five, and six all fractured. Dr. Smith noted the difficulty in fracturing the first rib because it is protected by the upper arm, collar bone, and shoulder blade and due to its alignment. He stated the fractures could have resulted from a compression of the chest. He opined that the fractures occurred while Mr. James was still alive as there was bleeding into the soft tissue around the ribs.

Dr. Smith testified that the autopsy of Mrs. James was primarily performed by Dr. Terry Campbell but that he also observed the autopsy. He noted Mrs. James was 5'6" tall and weighed 184 pounds. He did not recall seeing a small square piece of duct tape on Mrs. James. Dr. Smith said Mrs. James suffered from multiple incised wounds to her neck, compressive force applied to the neck, perforation of the left internal jugular vein and external jugular vein, and perforation of the left common carotid artery at the bifurcation where it branches off into the carotid artery that goes up into the brain.

Dr. Smith testified Mrs. James had incised wounds to the neck and chin area and two incised wounds at her voice box that ran together. Another incision started at the left side and came up as a hook, and the wound was five and one-tenth inches in length and up to an inch wide. Dr. Smith explained that although the incision was only one wound, the neck was redirected two more times so that there were three separate channels. There were also several irregular superficial scratches or incisions along the right margin of Mrs. James' jaw line, which Dr. Smith opined occurred while she was still alive.

Dr. Smith testified he removed the hyoid bone and fifth and sixth cervical vertebra. He noted six cut marks on the left side of the vertebra. He could not determine whether the edge of the knife was smooth or serrated. He said the progress of the knife through the bone was left to right and from front to back. The doctor also said the wounds to the bones were shallow, which would require that the knife go through the full soft tissue of the neck in order to reach that bone.

Dr. Smith testified regarding evidence of strangulation. He noted two parallel linear

marks on the front of Mrs. James' neck that had bruised the skin and the sternocelidomastoid muscle. Dr. Smith stated pressure had been significantly applied to that area of the body. Mrs. James also had petechiae in the whites of her eyes, in her face, and inside the lining of her mouth, as well as bruising to her tongue. She had bruises to both her windpipe and the esophagus or food pipe as a result of compressive forces. Dr. Smith said Mrs. James had petechiae in the epiglottis, which protects a person's trachea and windpipe when the person shallows and keeps the person from inhaling food. He stated the object used to strangle Mrs. James appeared to have been rigid, such as a single rod that was applied twice or two rod-like materials that were applied at the same time. The doctor explained that in order to have used a rope as a ligature, it would have to have been held extremely taut to remain rigid and have limited contact with the skin. Dr. Smith said ropes generally leave distinctive marks on the skin but that there were no such marks on Mrs. James.

Dr. Smith found evidence of ligature bindings on Mrs. James' arms. There was a bruise on the right wrist, incisions on the right forearm, and a postmortem incision on the left wrist. Dr. Smith testified the incision on the right forearm was "anti mortem" or occurred when Mrs. James was in the act of dying. He did not find any pressure marks on Mrs. James' left wrist indicating a ligature. He stated he based his opinion of a possible ligature mark on Mrs. James' right wrist upon the circumstances surrounding the crime scene, including the bruise, and the ligature marks on Mr. James.

Dr. Smith testified Mrs. James had a pattern pressure mark on her ring finger, as well as two areas where the top surface of the skin was scraped away. He stated the skin could have been scraped away as the result of someone forcibly taking the rings off of her finger.

Dr. Smith opined each victims' death was the result of multiple injuries. The doctor was unable to determine which injury actually caused each victim's death. He said, "The major wounds of sharp force were inflicted during life, and the affixation or strangulation was applied during life, so they would have to run concurrent." He found no evidence that the victims had been sexually assaulted.

On cross-examination, Dr. Smith testified this case was unusual in that there were two victims in a normal home. He explained multiple homicides generally occur in places where other types of criminal activity are occurring. The doctor stated it was also unusual to see the separation of the victims and that due to the injuries suffered, the killer had a great deal of contact with the victims. Dr. Smith testified Mr. James had several modes of death, including the knife wounds, the strangulation, and the chest injuries that could have interfered with his breathing. Mrs. James had two mechanisms of death. Dr. Smith stated that although the multiple mechanisms of death are unusual, he has seen it on previous occasions. He also stated cuts to the throat, strangulation, bondage, or the combination of

the three are not unusual. Dr. Smith explained, "It's not all common for these modalities to be used but, again, it's something that you see. It basically is what it is."

Ravindra Patel testified that in August 2003, he was a manager at the Super 8 Motel in Melbourne, Florida. Mr. Patel recalled that on August 26, 2003, at approximately 1:00 p.m., he was using a leaf blower on the parking lot when he saw a white mid-sized car with four doors drive up and park in the middle of the parking lot. Mr. Patel was shown a photo of Dodge Aires that Detective Reyes previously identified as similar to the vehicle that Mr. Young was driving when he pulled him over and testified that while the car was the same size as the car that he saw in the parking lot, he was unsure whether it was the same car. Mr. Patel saw a white man exit the car and enter the hotel through the main entrance. The man returned to the car after a few minutes, and he and an African American man then entered the hotel. Mr. Patel described the white man as taller than the African American man and skinny. The African American man was wearing long pants, an undershirt, and an unbuttoned shirt. Mr. Patel believed both men were nineteen or twenty years old.

Mr. Patel testified that according to the motel registration card, Carlos Perez checked into the motel and was assigned to Room 217. The next day, no one came to check out of the room by 11:00 a.m., the normal time to check out. At approximately 11:30 a.m. or 12:00 p.m., housekeeping knocked on the door, but no one answered. After housekeeping entered the room, they contacted Mr. Patel. Mr. Patel said he opened the door to the room, saw blood on the bed, and called 911. While waiting for police to arrive, he stood by the door to prevent others from entering the room.

William Perez, Carlos' father, testified that in August 2003, nineteen-year-old Carlos was living with him in Wilton Manor, Florida, which is near Ft. Lauderdale. Carlos was working for Dependable Temps, a temporary employment facility. Mr. Perez said he last saw Carlos alive on August 25, 2003, at his home. Carlos generally left for work at 5:00 a.m. and returned at 5:00 p.m. Carlos did not drive but walked to work. When Carlos did not come home that night of August 26, Mr. Perez called his cell phone, but Carlos did not answer. Mr. Perez continued to call Carlos and his friends, but his friends did not know where he was.

Mr. Perez testified that the next morning, he continued to call Carlos' friends and attempted to notify authorities. The Ft. Lauderdale Police Department directed him to the Wilton Manor Police Department, but he was not allowed to file a report as Carlos had been missing for less than forty-eight hours. Mr. Perez submitted a report after forty-eight hours. He learned of Carlos' death from two detectives who came to his place of employment.

Detective Scott Dwyer, who was assigned to the crime scene unit of the Melbourne Police Department, testified he was called to the scene at the Super 8 Motel to assist in

processing the crime scene. He stated drugs and prostitution were prevalent at the motel. He was contacted by another detective who wanted him to examine stains on a door leading into the east end of the building. He did a presumptive blood test, and the results were negative.

Detective Dwyer testified he processed the door of Room 217 for possible fingerprints and any type of fiber or DNA evidence. He obtained latent lifts from the door and door jam area. Before entering the room, the detective put on gloves and booties to avoid contaminating the scene. Officers were at the motel for three days processing the room for ten to twelve hours per day.

Detective Dwyer said that from the threshold of the room, he observed a comforter, a blood stain, and a pillow on the bed. He stated it was obvious that there was a male underneath the comforter. He took photographs of the scene and placed the comforter and the pillow covering the victim's head in an evidence bag. Detective Dwyer observed lacerations on the side of the victim's neck. He stated that from the position of the body, he believed the crime was sexual in nature.

Detective Dwyer used a forensic vacuum and a self-contained filter to process the flooring for hairs, fibers, and any type of micro evidence. He was able to lift fingerprints from the room, but none of them matched the fingerprints of Appellant or Mr. Young. He also searched the bathroom for possible foot and footwear impression on the tile floor. Detective Dwyer said that using an alternative light source, he was able to observe footwear impressions and that the floor was somewhat wet at one time. He used lifting tape to lift footwear impressions and placed them on cards. He also photographed the footwear impressions before lifting them.

Detective Dwyer said he observed a blood stain pattern on the headboard area of the bed and on the south wall where the victim's head was facing. He testified the pattern on the south wall was a projected blood pattern, which resulted when blood exited the body and projected on a surface or area. He found twenty-five individual points of the blood stain on the wall.

Detective Dwyer testified the wall and different furniture appeared to have been wiped down with a wet towel or cloth. The shades of the table lamps also appeared to have been wiped down and had cloth marks on them. Detective Dwyer said the phone cord had been cut with a sharp object. There were no towels in the bathroom or any storage area, and the pillow cases to the pillows that were on and under the victim were missing. The victim's identification, personal items, and clothing were also missing.

Detective Johnny Lawson of the Melbourne Police Department testified he entered the motel room after the evidence technicians had left. He stated the motel was located in a high crime area. He observed the victim lying on his stomach with a pillow across his head. The victim was nude and lying across the bed rather than up and down the bed as a person would normally lay. Detective Lawson said the victim's neck had been opened with a sharp object and appeared to have multiple cuts. He later noted ligature marks to the victim's body. He said that although the offense appeared to involve sexual activity, he could not confirm that such activity occurred.

Detective Lawson testified Carlos Perez's name and a Pennsylvania driver's license number were listed on the check-in sheet to Room 217. Officers were able to trace the number back to the Florida Department of Motor Vehicles, which also had a photograph of Mr. Perez on file. Detective Lawson identified Mr. Perez through the photograph. An address in Wilton Manor was listed on the Florida license, and detectives located Mr. Perez's father in Wilton Manor.

Detective Lawson stated he and four other detectives went to a temporary labor place in Ft. Lauderdale where Mr. Perez was to go to work on the morning of August 26. The detectives talked to different people and showed them photographs of the victim. Detective Lawson learned from local agencies that the Bartlett Police Department was investigating a double homicide with similar features and that one of the victim's credit cards had been used on August 24 in the area of I-95 and U.S. 192 called West Melbourne. The credit card transaction was a gas purchase at the pumps. Detective Lawson obtained a copy of the surveillance video from the gas station and saw that the car involved was a white four-door 1990's model Lincoln Towncar. Due to the lack of clarity in the video, Detective Lawson was unable to identify the driver of the vehicle.

Detective Lawson testified he and other officers returned to the temporary employment agency, where they talked to different people and showed them photographs of Mr. Perez. Detective Lawson said he and another detective looked across the street and saw a white four-door 1993 Lincoln Towncar parked in front of the temporary agency. They walked over to the car and noted that the tag on the back of the car was a Miami Dolphins tag with the name "BAM69." Detective Lawson stated he and the other officers left to run the tag and learned that the tag was registered to Appellant. When the officers returned to the temporary agency, the car was gone. Detective Lawson later received information from the Brevard County Sheriff's Office that one of their officers conducted a traffic stop involving a white Lincoln Towncar. The stop was conducted on a different vehicle but was related to the same person who owned the "BAM69" tag. Detective Lawson learned an arrest was made during the stop and that the person who was arrested was transferred to Ft. Lauderdale. He contacted the Bartlett Police Department, and he and Detective Massey

traveled to Ft. Lauderdale and interviewed Mr. Young.

Detective Lawson testified he and other officers went to the address listed on Appellant's license in an attempt to locate Appellant and the Lincoln. The Bartlett Police Department notified the officers that either they had indicted Appellant or they had planned to indict him. The detectives assisted Bartlett police officers in obtaining a search warrant through the Florida Department of Law Enforcement (FDLE). The Lincoln was found at the address listed on Appellant's license, and it was towed to the Florida Crime Lab in Orlando. Officers later seized the Dodge Aires pursuant to a search warrant.

Detective Lawson said he obtained a copy of a bus ticket found in one of the vehicles. The ticket was a one-way ticket from Ft. Lauderdale to Melbourne dated August 27, 2003. The departure time was 4:00 a.m., and the arrival time was on 8:15 a.m. Detective Lawson was unaware of whether the ticket was used.

Detective Lawson testified that on April 26, 2004, he came to Shelby County to execute a warrant allowing him to obtain samples of Appellant's hair. The hair samples were sent to the Federal Bureau of Investigation for processing.

Special Agent Tom Davis of the FDLE testified that in September 2003, he participated in obtaining and executing a search warrant on a Lincoln Towncar with license number "BAM69." The car was seized from the Wilton Manor area and transported to the regional laboratory in Orlando, Florida. Special Agent Davis also participated in obtaining and executing a search warrant for a Dodge Aires. Appellant was in possession of the Dodge, and the car was secured at the Ft. Lauderdale Police Department and transported to Orlando.

Patti Orta, a senior crime laboratory analyst with the FDLE, testified that in September 2003, she was asked to process and search two cars, a Lincoln Towncar and a Dodge Aires K-car, in connection with the homicide of Carlos Perez. From the trunk of the Lincoln, Ms. Orta recovered several pairs of shoes, a plastic bag from JCPenney, a pocketknife that was in the plastic bag, a roll of fishing line with a piece of duct tape on it, and three black twist ties. She submitted a pair of Nike tennis shoes found in the upper deck of the trunk to the serology and latent print sections for analysis. She lifted the backseat of the Lincoln and found a lady's ring. Ms. Orta took a photograph of the ring, which Ms. Coleman had earlier identified at trial as similar to one worn by Mrs. James. Ms. Orta stated the back seat and the right rear floor board were tested for blood, which revealed a "faint" positive. She cut these sections of the vehicle and sent them to the serology section for testing.

Ms. Orta testified that from the Dodge, she recovered papers with handwriting, a

pocketknife, a cigarette package, a pair of shoes, a handgun, an open jar of petroleum jelly, a Webster's Dictionary, a holder with pictures, photographs, and miscellaneous papers. All items were submitted to the laboratory, and some items were submitted for processing

Ms. Orta found a large amount of clothing in suitcases and bags in both cars. She also found cleaning supplies, including glass cleaner, engine degreaser, Suave lotion, wax, Dawn, ArmorAll, and rubbing alcohol. Most of the cleaning supplies were found in the Lincoln.

In August 2003, Emily Strickland was a crime laboratory analyst for the FDLE and specialized in latent print and footwear impression comparisons. The trial court admitted Ms. Strickland as an expert in footwear impressions. Ms. Strickland testified she was asked to compare a pair of Nike tennis shoes with latent prints taken from a crime scene in Melbourne, Florida.

Ms. Strickland testified evidence of footwear impressions from a crime scene may come in the form of lifts or photographs that have been enlarged on a one-to-one basis with the shoe. She explained the first task in comparing shoes and prints was to look for class characteristics of the impression. She would attempt to determine tread design and size and whether the impression was a right shoe or a left shoe. Ms. Strickland explained identifications of footwear impressions were based upon the fact that everyone wears their shoes differently. She said many manufacturers varied their shoes, including the arch and elements of the tread, according to sizes. Ms. Strickland contacted the manufacturer and learned that 650,000 shoes in all sizes were manufactured with the same tread design as the shoes that she tested.

Ms. Strickland testified she compared thirty-nine footwear impressions and four lifts. She said she inked the bottom of the shoes and created a test impression or overlay to lay over the photographs. She compared her test impression with each photograph. Ms. Strickland said she located an individual characteristic in both the test impression of the shoe and in the photographs of the impressions left at the scene. She referred to the individual characteristic as a "finger" and described it as a cut on the bottom of the shoe that resulted from wear. The "finger" on the test impression and the "finger" in the photographs were of the same length and located at the same point in the tread of the shoe.

Ms. Strickland concluded that the impressions and the shoes were sized ten and one-half. The impressions consisted of eighteen left shoes and twenty-one right shoes. Ms. Strickland said one impression was "most likely" made by the left shoe. Of the remaining impressions, seventeen "could have been" made by a left shoe, and twenty-one "could have been made" by the right shoe.

On cross-examination, Ms. Strickland testified she originally concluded that all thirty-nine impressions "could have been made" by the shoes. After reviewing the impressions as requested by the Melbourne Police Department, she concluded that one of the impressions was "most likely" made by the shoes. She testified, "I cannot say specifically that this shoe definitely made that impression. I'm saying most likely made by that shoe."

Craig Henderson, a field agent with the Federal Bureau of Investigation (FBI), was previously assigned to the FBI laboratory as a supervisor special agent forensic examiner in the Trace Evidence Unit. Agent Henderson examined trace evidence, including hair and fiber evidence. The trial court admitted Agent Henderson as an expert in the area of hair and fiber analysis and identification.

Agent Henderson testified he was asked to analyze items from a vacuum filter that were received from the Melbourne Police Department pertaining to the death of Carlos Perez. The filter was opened, and the hairs and fibers were removed from the filter and placed on glass microscope slides. Agent Henderson said a number of different hairs were found in the filter, as well as fibers. He stated he found two pubic hairs belonging to an African American in the filter. He compared the hairs to a sample of Appellant's hair and found that they exhibited the same microscopic characteristics. Agent Henderson testified his conclusion was not that the hairs belonged to Appellant but that he could not exclude Appellant as the owner of the hairs. He explained, "Hair comparisons are not an absolute means of personal identification. And certainly when doing our hair comparisons, the probative value of a hair comparison can be affected by the results of the mitochondrial DNA analysis."

Agent Henderson stated that once he determined the hair was consistent and exhibited the same microscopic characteristics, he took the hair to another examiner to confirm that association. After that association was confirmed, he removed one of the pubic hairs from the slide, dry-mounted it to another slide, and sent it to the evidence control center where it was then sent to the mitochondrial DNA analysis unit.

Catherine Theisen was the chief of the Quality Assurance and Training Unit of the FBI laboratory in Quantico, Virginia. She previously spent nine years as a forensic mitochondrial DNA examiner at the laboratory. The trial court admitted Ms. Theisen as an expert in mitochondrial DNA analysis.

Ms. Theisen testified DNA is made of building blocks referred to by four different letters: A, C, G, and T. She explained there are two kinds of DNA, nuclear DNA and mitochondrial DNA. Nuclear DNA is inherited from both parents and is unique to the individual except in cases of identical twins. Mitochondrial DNA is inherited only from the

mother and is not unique to an individual. A person will share mitochondrial DNA with the person's mother, anyone related through the person's mother, and other individuals at random in the population. Ms. Theisen explained mitochondrial DNA is used in forensics because the analyst is able to obtain results in situations where sufficient nuclear DNA cannot be obtained such as hair, teeth, and bones or where the nuclear DNA is otherwise degraded. Although mitochondrial DNA is not unique to individuals, it is highly variable in the population. Ms. Theisen acknowledged mitochondrial DNA is more sensitive to contamination than nuclear DNA through items introduced in the lab.

Ms. Theisen testified the steps in analyzing mitochondrial DNA are similar to the steps in analyzing nuclear DNA. The DNA is first extracted out of the cells. The DNA then goes through a process called amplification, during which many copies of a specific region of the DNA are made. The DNA undergoes a process called sequencing where the actual orders of the building blocks are determined. The sequencing is then compared. If Ms. Theisen is not able to exclude someone as a source of an item of evidence, she compares the sequence or type to a database of sequences to provide an estimate of how common or rare the mitochondrial DNA type is in the population.

Ms. Theisen stated she received hair to analyze, as well as a known sample from Appellant. She was able to extract, amplify, and sequence mitochondrial DNA from the hair and the sample from Appellant. Ms. Theisen then compared the samples. She said she found that the mitochondrial DNA sequences from both sources were identical with one exception. Ms. Theisen explained the exception was a particular position of the mitochondrial DNA, which was known to be a variable within individuals and had many C building blocks in a row. At one particular position, the hair primarily had seven Cs in a row but some cells had eight Cs and nine Cs. The DNA sample from Appellant included primarily eight C building blocks but also had some cells with seven Cs and nine Cs. Ms. Theisen testified that because the two mitochondrial DNA types were so closely related, she could not exclude Appellant as the source of the hair.

Ms. Theisen testified she compared the DNA type to a database to determine how common or rare the DNA type was. The DNA type did not appear in the database. She stated she would not expect to see that DNA type in more than .26 percent of the African American population in the United States, more than .17 percent of the Caucasian population, or more than .39 percent of the Hispanic population. Ms. Theisen also compared the sequence of the hair to a sample from Carlos Perez and determined the DNA types were so different that she excluded Mr. Perez as the source of the hair.

Dr. Sajid Qaiser, who was employed by the Brevard County District 18 Medical Examiner's office in Rockledge, Florida, was admitted by the trial court as an expert in

forensic pathology. Dr. Qaiser performed the autopsy of Carlos Perez in August 2003. Mr. Perez was 6'1" tall and weighed 142 pounds. Dr. Qaiser testified Mr. Perez had a ligature wound around his neck, a deep incision wound, and multiple cuts on the front, sides, and back of his neck. The toxicology report of Mr. Perez showed the presence of marijuana.

Dr. Qaiser testified that the ligature used to strangle Mr. Perez was approximately one-fourth of an inch wide and that the marks were "[c]learly visible" on the victim's neck. The doctor noted the victim's hyoid bone and larynx were intact. He explained that in the majority of cases of asphyxia where the hyoid bone is broken, the victim is an older person with calcified and brittle bones. The breaking of the hyoid is also seen in manual strangulation where the hand is applied generally to the upper side of the neck. Dr. Qaiser stated other evidence of strangulation in addition to the ligature around Mr. Perez's neck were the petechiae hemorrhages on his face and upper eyelids and conjunctiva or the lining of the mucus membrane or soft tissue inside the eye. Dr. Qaiser acknowledged asphyxia or strangulation is not the only cause of petechiae.

Dr. Qaiser testified to observing an approximately three-fourths circumference cut of the sternocleidomastoid muscle, the big muscle in the neck. The external jugular vein, the major vein that drains blood into the heart, was severed. Multiple strap muscles, soft connective tissue, and the larynx or "sound box" were also cut. Dr. Qaiser observed an incision on the fourth cervical vertebra. He explained that to achieve this incision, the knife had to pass through the skin, the soft connective tissue, the major skeletal muscle of the neck, and the smaller skeletal muscle of the neck with incision on the bone. The primary incision was nine inches long, one and three-fourths inches wide, and one to two inches deep. Dr. Qaiser explained the rim of the incised wound was red and swelling, which is called vital reaction signifying that the incision occurred while the victim was alive. Dr. Qaiser found seven or eight different incised wounds that were confluent with the primary wound. He noted aspiration of blood was evident in both lungs as illustrated by blotchy areas. He said that the esophagus was cut, which resulted in the blood being aspirated and then ingested.

Dr. Qaiser testified to evidence of the application of ligatures on both of the victim's wrists and ankles. He observed furrow marks consistent with the application of ligatures on Mr. Perez's ankles. Furrow marks, abrasions, and residue from tape were on Mr. Perez's wrists. He noted hyperemia or redness where the ligature was applied. Dr. Qaiser explained that when an item is applied to skin, the area becomes pressurized, and the blood is displaced to the side. The longer the item remains on the area, the more evident the hyperemia becomes. Dr. Qaiser said that due to the color and texture of the abrasions, they are likely to be postmortem. He further said the ligatures or tightening bands were removed in a rush, resulting in the abrasions. Dr. Qaiser could not rule out duct tape as the material used to bind the victim and noted "glue stuff" on the back of the victim's head.

Dr. Qaiser observed an injury on the upper right side of Mr. Perez's back that was consistent with a bite mark. He testified that the victim's anal cavity was dilated and that he observed abrasions and a mucoid substance in the area. Dr. Qaiser stated that this evidence suggested sexual activity and that the ligature marks on the victim's wrists and the abrasion suggest the sexual activity was non-consensual. He opined that Mr. Perez's cause of death was ligature strangulation and incised wounds to the neck and that the manner of death was homicide.

After the State rested, the defense presented the testimony of Dr. Theodore Dean Kessis, who was employed at a consulting firm called Applied DNA Resources and assisted attorneys in reviewing case work and in witnessing DNA testing. The trial court admitted Dr. Kessis as an expert in mitochondrial DNA analysis. Dr. Kessis testified he reviewed Dr. Theisen's report and noted the results did not positively identify Appellant as the donor of the hair. He explained, "Mitochondrial DNA is never considered a unique identifier or a positive identifier of any type of a test that you can use the term 'match' with." The doctor stated that tens or hundreds of millions of people have that particular DNA sequence and that the DNA sequence is not gender or race specific. He agreed that Appellant could not be excluded as the individual who could have left the hair in Melbourne, Florida.

Dr. Kessis testified the greatest potential problem with mitochondrial DNA analysis is contamination, which could result in a false positive. He also testified Dr. Theisen's conclusions regarding the percentage of the population would be correct or close to the percentage only approximately 95% of the time.

At the conclusion of the guilt phase, the jury convicted Appellant of two counts of premeditated first degree murder and two counts of felony murder in the perpetration of a robbery.

**SENTENCING HEARING**

During the sentencing hearing, the parties stipulated that Appellant had previously been convicted of the following offenses in Broward County, Florida: robbery and kidnapping on July 21, 1982; two counts of battery on a law enforcement officer on March 29, 1982; and aggravated battery on April 23, 1982. The parties also stipulated that the felony offenses constitute crimes of violence against the person.

The State presented the testimony of Turkessa Helton, Mrs. James' granddaughter. Ms. Helton testified she was close to Mrs. James and that her grandmother would never see her children grow up. She said that her family was close and that her aunt would take Mrs. James shopping every Saturday. Ms. Helton's father visited Mrs. James every Friday. Ms.

-24-

Helton testified Mrs. James was missed at church and during holiday and family gatherings. Ms. Helton said that Mr. James was nice and generous and that his children called him daily. Following Ms. Helton's testimony, the State rested.

The defense presented the testimony of Eddie Jones, Appellant's brother. Mr. Jones testified he was originally from Cleveland, Mississippi, and lived in Ft. Lauderdale, Florida. Mr. Jones stated he and Appellant grew up in a family of fourteen children, including ten boys and four girls. Mr. Jones described their childhood as "rough" and stated Appellant's father was not around. Their brothers were in charge of them because their mother worked nights. Their brothers abused them by beating them with water hoses and extension cords and burning them with cigarettes. Mr. Jones recalled an occasion when Appellant was five years old during which one of their brothers gave Appellant a gun and instructed him to shoot Mr. Jones. Appellant pulled the trigger, but the gun was not loaded.

Mr. Jones testified they moved to Florida when he was twelve years old. After the move, Appellant began getting in trouble and went to jail for fifteen or sixteen years. Mr. Jones asked the jury to have mercy on Appellant.

Appellant testified he was born in Cleveland, Mississippi, in a family of ten boys and four girls. Nine of them lived in a two-bedroom house. Appellant said he had a "rough" childhood and was beat with water hoses and belts by his brothers. He saw other siblings burned with cigarettes. Appellant did not know his father growing up but talked to him after he grew older. He said his mother was always there for him.

Appellant said that when he and his family moved to Ft. Lauderdale, he began getting in trouble. When he was eighteen years old, he was arrested for offenses related to a robbery and sentenced to thirty years, of which he spent sixteen years in jail. After going to jail, Appellant wrote the man who he had robbed, apologized, and continued to communicate with him over the years.

Appellant denied killing the victims. He admitted he had walked past the victims' residence numerous times in the yard, but he denied ever speaking to Mr. James. Appellant testified he met Mr. Young at a club in Ft. Lauderdale and later saw him at a park. He denied paying Mr. Young for oral sex or sexually assaulting him. He said he took Mr. Young with him to Bartlett after Appellant and his girlfriend got into an argument in Daytona. They visited Mrs. Armstrong at her home and then went to Burger King. After they left Burger King, they went to a BP gas station. Appellant testified that when he returned to his car from the store, he saw Mr. Young with a crack pipe and made him get out of the car. Appellant later returned to pick him up. Appellant maintained he went to Deerfield Apartments to get his mail and visit a former neighbor. Upon leaving Memphis, Appellant intended to go to

Cleveland, Mississippi, but purchased a Lincoln at a car dealership in Batesville instead. He denied using the victims' credit card to purchase gas.

At the conclusion of the sentencing hearing, the jury unanimously found the presence of four statutory aggravating circumstances with regard to the murder of Mrs. James: (1) Appellant was convicted of one or more felonies involving the use of violence; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of Appellant or another; and (4) the murder was knowingly committed while Appellant had a substantial role in committing a robbery. *See* T.C.A. § 39-13-204(i)(2), (5), (6), (7). The jury unanimously found the presence of the same four statutory aggravating circumstances with regard to the murder of Mr. James, as well as an additional statutory aggravating circumstance, that the victim was seventy years of age or older. *See id.* at (i)(14). The jury determined that these aggravating circumstances outweighed any mitigation circumstances and imposed a sentences of death.

## ANALYSIS

Appellant raises four issues on appeal arguing that (1) the trial court erred in admitting evidence of the homicide of Carlos Perez; (2) the evidence is insufficient to support the convictions; (3) the trial court erred in admitting photographs of the victims and Mr. Perez and a videotape of the crime scene; and (4) the death penalty is unconstitutional.

## I. ADMISSION OF EVIDENCE OF THE HOMICIDE OF CARLOS PEREZ

Before trial, the State filed a notice of intention to use evidence of other crimes to establish identity. Specifically, the State sought to introduce evidence of the homicide of Keith Gross on September 7, 2002, and the homicide of Carlos Perez on August 27, 2003. Following an evidentiary hearing, the trial court entered an order excluding evidence of the homicide of Mr. Gross. With regard to Mr. Perez's homicide, the trial court found that the method of the commission of the offenses was unique and that the evidence clearly and convincingly established that Appellant was the perpetrator. The trial court held a determination of whether evidence of the homicide of Mr. Perez should be admitted into evidence in abeyance until trial. During trial, the trial court found that identity was a material issue at trial and that the probative value of the evidence of Mr. Perez's homicide was not substantially outweighed by the prejudice to Appellant. The trial court then allowed the State to present evidence of Mr. Perez's homicide.

Appellant asserts the trial court erred in admitting evidence of the homicide of Mr. Perez in order to establish identity. Appellant maintains the evidence of the homicide was

irrelevant to the issue of identity, did not clearly and convincingly establish that Appellant committed the homicide, and was unfairly prejudicial.

## A. Pretrial Hearing

Ms. Coleman testified that at the time of their deaths, Mrs. James was sixty-six years old, and Mr. James was eighty-two years old. In 2003, the victims were living in Bartlett. Mr. James was retired from the City of Memphis, and Mrs. James worked the 5:00 p.m. to 1:30 a.m. shift in environmental services at Methodist Hospital. Neither victim drove. Mrs. James would take the bus to work, and one of her children would pick her up at night.

Ms. Coleman testified that when she arrived at the hospital on Friday, August 22, 2003, she discovered that Mrs. James was not there. She believed Mrs. James had found someone else to take her home. A storm had affected the telephone system, and when Ms. Coleman called the victims' house, no one answered.

Ms. Coleman stated that although she called the victims the next morning without success, she believed the telephone systems had not yet been repaired. Between 2:30 p.m. and 3:00 p.m., she drove by the victims' house and saw that the garage door was down. She explained the victims usually raised the garage door by that time, and Mr. James would work in the yard. The front door was cracked open, so Ms. Coleman entered the house. She called for Mrs. James, but no one answered. She saw that a closet door was open and that linens and other items were falling out of the closet. She looked in the dining room and saw scissors, a drink bottle, papers, and other items on the floor. Ms. Coleman said Mrs. James always kept a clean house. Ms. Coleman took the telephone, ran outside, and called 911. Police officers arrived shortly thereafter. Ms. Coleman recalled that Mrs. James owned several credit cards, as well as diamonds and gold jewelry and that Mr. James owned a brown wallet.

Officer Devers testified that on August 23, 2003, at approximately 3:31 p.m., he received a call to conduct a welfare check on residents of a home on Bartlett Boulevard. When he arrived, he was met by Ms. Coleman. Officer Devers entered the home and saw an open linen closet with linens that were pulled out of the closet and onto the floor. He entered a bedroom where he saw a mattress crossways on the box springs. The chest of drawers was opened, and items had been pulled out onto the floor. Officer Devers also observed a lamp in the dining room with an electric cord cut off of it. He entered another bedroom where he found an African American female laying face down in a large pool of blood and clothed only in underwear. Officer Devers said the victim's head was "almost cut completely off her body." He exited the residence and spoke to Ms. Coleman.

Officer Devers testified he waited for another officer to arrive before re-entering the house. Officer Devers and Officer Robert Allen entered the house while Officer Ray Hill remained outside to secure the scene. Officer Devers entered a small utility room where he found Mr. James lying on the floor. He explained he did not enter the room because he would have struck Mr. James' body with the door had he opened it any further. Once they discovered Mr. James' body, the officers exited the residence and waited for other officers to arrive.

Investigator Massey testified that on August 23, 2003, he was called to the victims' Bartlett Avenue address and entered the crime scene. He prepared a diagram of the rooms and noted certain items of evidence found in the rooms. After walking through the entry, he saw an empty Sprite carton on the floor and a pair of scissors just inside the living room. To the left was a linen closet which was open, and linens were on the floor. A rag was on the dining room floor. Investigator Massey looked into the first bedroom and saw a drawer pulled out with clothing draped over it. He stated it appeared that someone had gone through the victims' belongings. In one of the bathrooms, Investigator Massey observed blood on the counter top and in the basin near the drain.

Investigator Massey testified he saw a small piece of duct tape approximately the size of a quarter on Mrs. James' right shoulder. He did not recall where the tape was on her shoulder. He did not see any duct tape on her shoulder in the photographs of the crime scene. He also saw a cord under Mrs. James' right foot.

Mr. Young testified he met Appellant, who went by the name "Bambam," in Ft. Lauderdale in August 2003. Mr. Young had been living with a girlfriend and left the residence after an argument. He stayed at a park in Ft. Lauderdale for one and one-half days. When he woke up one morning, he saw Appellant standing in front of him. Appellant introduced himself as "Bambam" and offered Mr. Young money in exchange for oral sex. Mr. Young said he agreed because he needed the money.

Mr. Young said Appellant, driving a light beige, four-door Dodge, first took him to McDonald's. After they ate, Appellant said he needed to pay some tickets. They went to a lady's house where Appellant made a telephone call. They then went to a pawn shop where Appellant pawned a gold chain and got a ring out of pawn. Appellant and Mr. Young went to a second pawn shop in Hollywood, Florida, where Appellant pawned the same ring. They then went to the courthouse in Miami where Appellant paid the tickets.

Mr. Young testified that as they were leaving the courthouse, Appellant's car ran out of gas. Appellant took a gas can out of the trunk of the car and walked to the nearest gas station down the road from the courthouse. After refueling the car, Appellant drove them to

a warehouse where Mr. Young performed oral sex on him. Appellant paid Mr. Young $20.00. While they were still in the warehouse, Appellant told Mr. Young about two women in Daytona, and Mr. Young agreed to go with Appellant. They first stopped at the residence of Mr. Young's grandmother so that Mr. Young could get a change of clothes.

Mr. Young testified he and Appellant met "Toosie" and "Tawana" in Daytona. Appellant and Toosie left and did not return until the next morning. They were arguing when they returned, and Appellant told Mr. Young that he wanted to leave. Mr. Young said that although he wanted to stay with Tawana, he agreed to leave with Appellant. Appellant told Mr. Young that they were going to visit his relatives. Mr. Young testified Appellant drove for one to one and one-half days. Mr. Young fell asleep, and when he awoke, they were parked at a Burger King located inside a gas station. Mr. Young said a man who worked at Burger King came to the car looking for "Bambam," but Appellant was not in the car. Mr. Young went to the bathroom, and when he came out, he saw Appellant talking to the man. Mr. Young sat at the table behind them, and an employee brought them food.

Mr. Young stated that after leaving Burger King, Appellant drove to an apartment complex and told him that they were "here." Mr. Young followed Appellant across the street and to a house where an older man was sitting in his garage. Appellant approached the man and asked, "Hey, Pops, how are you doing?" The man said he had just gotten out of the hospital where a pacemaker was placed in his heart. Mr. Young said he and the man discussed the man's experience in the Korean War. Appellant asked the man why he was outside, and the man said he was waiting on a man to cut his grass. Mr. Young offered to cut the man's grass for free. Instead, the man requested Mr. Young take the lawnmower, which was in the front yard, to the back yard. Mr. Young testified he complied with the man's request and put the lawnmower in a shed in the back yard. While in the back yard, he looked at a few statutes and a bird bath and drank water from a faucet.

Mr. Young testified that upon returning to the front yard, he saw that the garage door was closed and that no one was outside. He knocked on the front door, and when no one came to the door, he entered the residence. Mr. Young said he saw Appellant walk past him holding a rope and two towels, which had blood on them. Mr. Young followed Appellant into a room where Appellant threw an older woman on the floor. The woman was screaming, and Appellant asked her, "Do you know what time it is?" Appellant demanded her purse and money, and the woman told her it was in the other room. Mr. Young testified the woman was laying face down on the floor and was wearing clothes. He said Appellant tied up the woman's arms and legs and removed her rings from her fingers. Appellant instructed Mr. Young to sit down, and he did as instructed. Appellant then left the room.

Mr. Young testified the woman asked him if they were going to kill her. He told the

woman that he thought she was related to Appellant, and the woman denied knowing Appellant. Appellant returned to the room holding a purse, instructed Mr. Young to get out of the chair, and threw the purse into the chair. Mr. Young said Appellant picked up the woman and used her to push him into another bedroom. Appellant threw the woman into a chair, cut the rope off of her arms, and threw her on the floor. Mr. Young testified Appellant put the rope around the woman's neck, put his foot on the back of her neck, and strangled her with the rope. The woman tried to scream. Mr. Young said Appellant then took a knife out from under his shirt and cut the woman's neck. Mr. Young asked Appellant why he killed her, and Appellant said he had to kill her because she saw his face.

Mr. Young said Appellant left the room, and he heard cabinets "slamming." Appellant returned with a plastic "store bag" and instructed Mr. Young to hold it. Mr. Young initially refused, but complied after Appellant repeated the instruction while holding the knife. Mr. Young followed Appellant into the laundry room where he saw the old man lying face down on the floor with his hands tied behind his back. A pool of blood was around the man. Appellant removed the rope from the man's arms and legs and put them inside the bag. He instructed Mr. Young to run water inside the bag, and Mr. Young complied. Mr. Young testified Appellant snatched the bag away from him and took it to the room where the woman was lying. Appellant emptied the purse inside the bag, and they returned to Appellant's car.

Mr. Young testified Appellant threw items from the bag out of the window while driving down the road. Appellant stopped at a gas station where he used a credit card from the bag to purchase gas. Mr. Young said Appellant took the woman's billfold from the bag, removed the cash, and threw the billfold out of the window. Appellant gave Mr. Young $1,400.00 or $1,500.00 in cash and threatened to kill him if he told anyone about the events. They went to JCPenney at a large mall where Mr. Young used the money that Appellant gave him to purchase jeans and a black Marvel T-shirt. Mr. Young testified Appellant purchased a yellow Tommy Hilfiger shirt and light-colored khaki pants. They also went to a Foot Locker inside the mall where they both purchased shoes. Mr. Young stated that after leaving the mall, Appellant threw the rope, rags, and bag out of the car window. Appellant instructed Mr. Young to remove his clothes and discard them. Mr. Young changed into his new clothes and discarded the clothes that he had been wearing.

Mr. Young testified Appellant next drove to a car dealership where he purchased a white Lincoln Towncar. Appellant gave Mr. Young the keys to the Dodge and told him if he had any problems or had to stop that he was to flash his lights. Mr. Young followed Appellant to Florida. He testified he thought about crashing the vehicle, but he did not want to injure anyone. He explained that because the Lincoln was a faster vehicle, Appellant would have caught up with him if he tried to get away. Mr. Young said he decided to try to

pass Appellant or have a "car fight" with him. A police officer activated his blue lights as he was attempting to pass Appellant. Mr. Young admitted he gave the officer a fictitious name when the officer requested his license and registration. Once he provided his real name, the officer discovered Mr. Young had an outstanding warrant and arrested him. Mr. Young testified Appellant had given him the woman's rings and that he put them on when the police officer stopped him.

Mr. Young said when the detectives first interviewed him, he told them that Appellant killed the victims but did not tell them that he was inside the house and saw Appellant commit the crimes. When the detectives returned, Mr. Young admitted he was inside the residence also.

Mr. Smith testified he met Appellant on August 22, 2003, when he drove to a car lot in Batesville, Mississippi, where Mr. Smith was employed. Appellant arrived just prior to the close of business at 5:30 p.m. in a white Dodge Aires K-car. Mr. Smith saw another man with Appellant, but he did not meet him. Appellant purchased a white Lincoln Towncar. He told Mr. Smith that he had driven from Florida and that he had heard that he could purchase a vehicle for a reasonable price in that area. Mr. Smith testified he specifically recalled Appellant because the Dodge in which he arrived was unusual and Appellant had a tattoo of a teardrop below his eye.

Mr. Smith testified Appellant appeared to be in a hurry. When Mr. Smith informed Appellant of the purchase price of the Lincoln, Appellant went into the bathroom and returned with the money in his hand as if he had counted the money in the bathroom. (Appellant told Mr. Smith that he had received the money from a tax refund. Appellant and the other man left at approximately 6:30 p.m. with both the Lincoln and the Dodge. Mr. Smith said Appellant returned approximately one week later to correct an error on his title.

Investigator Reyes testified that on August 25, 2003, at approximately 1:00 p.m., he was driving southbound on Interstate 95 from Melbourne to a meeting in Palm Bay. He noticed a white Dodge Aires in his rear view mirror, and the driver was driving "very carelessly," cutting off vehicles and driving too close behind other vehicles. The car started tailgating him. The officer was driving an unmarked Chevrolet Lumina and activated his blue lights on the back window as a warning to the driver. The car backed off of Investigator Reyes' vehicle, but the driver soon began exhibiting the same driving pattern. The car passed Investigator Reyes' vehicle and was speeding, so the officer initiated a traffic stop. (

Investigator Reyes approached the car and asked the driver for his license, information on the vehicle, and proof of insurance. Investigator Reyes testified the driver seemed "a little nervous." The driver told him that he did not have a license on him and provided the officer

with a fictitious name. The driver stated he was following his stepfather, but he was unable to provide his stepfather's name. A few minutes later, a white Lincoln Towncar driven by Appellant pulled up behind their vehicles. Before the stop, Investigator Reyes had observed the Lincoln pass him on the interstate. Appellant attempted to exit the car, and the officer ordered him to remain inside the car. The officer then called for backup, and Sgt. Victor Deantis responded.

Investigator Reyes testified Appellant told him that the Dodge belonged to him and that he had met the driver through a friend. Appellant told the officer that he had just purchased one of the vehicles and had paid the other man to drive the Dodge for him to south Florida. Appellant provided the officer with the proper documentation for both vehicles showing that he was the owner, as well as his driver's license.

Investigator Reyes said he confronted the driver of the Dodge about the fact that he had provided a false name. The driver stated his name was Tevarus Young and provided his date of birth. Investigator Reyes testified he discovered that Mr. Young had an outstanding warrant from Broward County, Florida. The officer instructed Appellant to return in twenty to twenty-five minutes to retrieve the Dodge. Appellant left the scene, and Mr. Young was placed under arrest. Investigator Reyes testified Appellant did not return for the car, which remained on the side of the road. The officer stated that if the car remained on the side of the road for one or two days, a trooper or deputy would mark the car and then tow it away.

Dr. O.C. Smith, admitted by the trial court as an expert in forensic pathology, performed the autopsies of the victims. He testified that Mr. James was 5'9" tall and weighed 137 pounds. He opined the cause of Mr. James' death was "multiple injuries based on the fact that we had multiple injures to different areas of the body by different mechanisms." He further opined the manner of Mr. James' death was homicide.

Dr. Smith testified to three types of injuries to Mr. James' neck. First, Dr. Smith explained the spine of the neck was fractured which could have been caused by compression of the neck itself or forcible flexion of the neck. Second, compression forces were applied to the front of the neck from left to right that fractured the left side of the hyoid bone, which is located between the base of the jaw and the top of the Adam's apple. Finally, there were multiple incisions to Mr. James' neck that began to create one slightly ragged wound and a stab wound to the front right of his neck that went across the windpipe.

In explaining the flexion and compression of Mr. James' neck, Dr. Smith testified that if the head is bent down in a forceful fashion, it can cause the bones of the spine to compress so tightly that they begin to fracture. He said the compressive forces to the neck can produce strangulation. He also said that although the fractures of the hyoid bone and to the cervical

-32-

spine would not specifically result in death, "they indicate that the forces applied are moderate to severe and that those forces can have effects on other structures of the body that can result in strangulation." Dr. Smith testified the type of manipulation of the neck that would cause the compression and fracture of the hyoid bone would include anything causing the chin to drop down on the chest such as a "half-nelson," a maneuver where the forearm is across the neck and the other arm is at the back of the head. He explained that as the head is forced forward, it can compress the neck between the arm and the hand pushing the head down. This maneuver could have produced the type of compressive force that would injure both the neck and the spine.

Dr. Smith reported observing petechial hemorrhaging. He explained that in cases of strangulation, petechial hemorrhages can be found in and around the eyes, especially in the conjunctiva and other tissues around the eyes. can result from elevated blood pressure due to the compressive forces that block the blood flow returning to the heart. Another explanation is that as the body loses oxygen, the blood vessels become more porous, and the red blood cells leave the blood vessel and form small round hemorrhages in the tissues. Dr. Smith observed small pinhead-sized bleeding points about the whites of Mr. James' eyes. He admitted that asphyxia is not the only cause of petechial hemorrhaging and that other findings would be necessary in determining whether asphyxia occurred. In this case, the other findings included compressive force to the neck.

Dr. Smith testified Mr. James had one stab wound and four confluent incised wounds to his neck. He explained an incision is a wound made by a sharp instrument and is wider than it is deep. A stab wound results when the sharp instrument is inserted into the body rather than dragged across the surface. Dr. Smith stated the incisions were confluent or ran together.

Dr. Smith testified to finding evidence of ligatures or bindings on Mr. James' extremities. He observed pressure marks and bruising on both forearms indicating a narrow material had been applied to the skin in a forceful nature and for a long enough time to leave pressure marks on the skin. He also observed bruises on both of Mr. James' forearms and an incised wound on his left forearm with fragments of red copper-like metal in the incised wound. Dr. Smith testified the narrow pressure marks and bruising were consistent with the use of metal wire. He stated the incised wound demonstrated an absence of active bleeding, indicating that the wound occurred when Mr. James was in the act of dying or had already passed. The bruising underneath the ligature marks, however, indicated that Mr. James was bound while he was still alive. While Dr. Smith admitted there were no bindings on Mr. James, he said forensic evidence established Mr. James had been bound and that the bindings were then removed.

Dr. Smith testified Mr. James suffered blunt force injuries to his chest resulting in multiple rib fractures on both sides of the chest. The fractures the ribs on the left and right side were of such a degree that the rib cage was unstable. Dr. Smith said this type of injury resulted from a compressive force that pushed the front of the chest toward the back. One mechanism, among others, that would cause the injuries includes someone standing on Mr. James' back while he was laying face down on the floor. Dr. Smith opined these injuries were sustained while Mr. James was still alive. He noted Mr. James' bones were osteoporotic so they were fragile and more likely to fracture.

Dr. Smith noted a bruise on the right side of Mr. James' tongue, which could have been caused by a tooth pinching the area. He further noted bleeding on the left base on the tongue, which was associated with the stab wound that went from the right side to the left side of the neck. He discovered blood in Mr. James' airway, which is typically found when a person has bleeding in the upper airway from the nose downward. Dr. Smith explained that as the person tries to breathe, the blood goes down the windpipe and is brought into the air sacs of the lung filling the sacs with blood.

Dr. Smith testified he also prepared a report of the autopsy of Mrs. James. Mrs. James was 5'6" tall and weighed 184 ½ pounds. The doctor said Mrs. James suffered from multiple injuries, including multiple incised wound on both the left and ride sides of the neck, injuries resulting from strangulation, and bruises to various areas of the body. He opined the cause of Mrs. James' death was multiple injuries from a homicide.

Dr. Smith stated Mrs. James had five incised wounds to her neck. A wound to the right side of her neck was composed of two confluent incisions and went to maximum depth of nine-tenths of an inch to one inch. An incised wound to the left side of Mrs. James' neck had three separate pathways and went to a depth of three inches, striking the bones of the neck at the fifth and sixth cervical vertebra. Dr. Smith stated superficial incisions were under the chin and that the active bleeding indicated the injuries occurred while Mrs. James was still alive.

Dr. Smith testified to observing evidence that Mrs. James was strangled. He observed "parallel line like" bruises predominately on the right side of the neck. There were deeper contusions or bruises to the muscles underneath the parallel linear marks. Dr. Smith observed bruises to the top of the tongue, the back of the throat, and the top of the windpipe that indicated the compressive force may have driven the tongue and the uppermost part of the airway back with enough force to cause them to bleed. He said the line-like bruises on the neck were fairly short, indicating that a hard object was used to compress the neck. He explained that a ligature would be expected to leave more of a "line like mark" that would completely or almost completely encircle the neck. Rather than using a flexible object, the

hard object could have been held against the neck with enough force to compress the neck and leave the marks present on Mrs. James' neck. Dr. Smith testified the character of the bruising showing parallel lines on the neck indicated the use of an object with a straight edge that was applied twice or an object with two straight edges.

As further evidence of strangulation, Dr. Smith observed petechiae of the conjunctiva and the face. He identified a photograph showing confluent bleeding into the membranes of Mrs. James' eyes. Dr. Smith said the petechiae can run together and produce this type of bleeding. He also said that due to the extensiveness to this bleeding, it may have been caused by other forms of injury such as blunt trauma.

Dr. Smith testified there was evidence that Mrs. James was bound, including bruises on her right wrist. Mrs. James also had incisions on the inside of her forearm and on the right wrist just above her palm. Dr. Smith said these incisions were similar to those on Mr. James and may have resulted from the severance of a ligature. Dr. Smith admitted there were no pattern marks of a ligature and that he could not positively establish that Mrs. James was bound. Mrs. James also had a pressure mark on her left ring finger where it appeared that two rings had been. A small abrasion was in front of the area of the compression or pressure mark. Dr. Smith stated he did not know the significance of the abrasion but that it was possible that the abrasion occurred while the ring-like object was being removed.

On cross-examination, Dr. Smith testified he had been a forensic pathologist since 1983, was an assistant medical examiner until 1999, and was the chief medical examiner in Shelby County from 1999 to 2004. He stated that during that time period, he performed autopsies in a number of homicides and provided autopsy services for twenty-one counties in West Tennessee, including Shelby County. Dr. Smith said that in a great number of homicides, the cause of death was multiple injuries and that the majority of homicides involved gunshot wounds or stab wounds. He also said that as of 2003, throat cutting was not an unusual method of homicide. According to Dr. Smith, asphyxiation by strangulation was probably a more common means of homicide than cutting someone's throat. He testified the combination of asphyxiation and throat cutting was not unusual. Dr. Smith also testified bondage was not unusual and had seemed to increase over the years. The doctor stated the combination of asphyxiation, throat cutting, and bondage as a means of homicide was not unusual. Dr. Smith found no evidence of sexual assault or sexual deviancy on the bodies.

Dr. Smith testified cutting or incising skin with a non-surgical knife was "inefficient." He explained that skin is loose, and even more so with an eighty-year-old man. When the cutting edge of the knife is applied to the surface of the skin and dragged across it, the skin will move. As a result, the power of the knife is lost, and the first incised wound generally will not open up the skin. When the knife is reapplied in a slightly different area, it cuts into

the area from the prior incision. Dr. Smith explained that once the knife gains access to the deeper tissues, it cuts with more efficiency. The knife can be applied in a serial fashion to increase the depth of the injury with each subsequent cut. Dr. Smith said, "But to take an object like a knife, apply it to the skin surface once, and attain a deep cut, is–I don't think I've actually ever seen that." Dr. Smith also said to find a single application of a knife in a throat cutting incident would be unusual. Dr. Smith agreed four confluent incisions on a throat were more common in cases where the victim's throat was cut fewer than four confluent incisions. He also agreed a stab wound was not particularly rare. He stated this case had the same appearances of many other cases where the victims had their throats cut.

Dr. Smith testified Mrs. James was found lying face down with a pool of blood behind her. He stated that because Mrs. James bled primarily from her neck wounds, she was in a different position than the position in which she was found at the time that the neck wounds occurred. After Mrs. James received the neck injuries, either she moved or someone moved her. Dr. Smith said the position in which Mrs. James was found was not an unusual position in cases where injuries to the throat were the means of death.

On redirect, Dr. Smith testified that approximately one-half of the homicides in Memphis were gunshot wounds and that knife wounds were in the minority of homicides in Shelby County. Of those involving knife wounds, some of the homicides involved stab wounds; some involved multiple stab wounds; and some did not involve incisions. A small number of cases involved incisions, strangulation, and binding. An even smaller number involve multiple incisions to the throat, strangulation, binding, removal of the bindings, leaving the body face down, cleaning up the crime scene, and robbing the victim by someone known to them. On re-cross-examination, Dr. Smith testified that while the victimology was unusual, nothing about the methodology of the homicides was unusual.

Mr. Patel, the manager of the Super 8 Motel in Melbourne, Florida on August 26, 2003, testified that on that day between noon and 1:00 p.m., while he was working in the parking lot, he saw a white mid-sized, four-door car drive up and park in the center of the parking lot. A tall, skinny white male wearing a T-shirt and shorts exited the vehicle and entered the office. Mr. Patel stated the man was nineteen or twenty years old. The man returned to the car, and then he and a skinny African American male wearing a T-shirt and a button up shirt exited the vehicle and entered the motel. Mr. Patel said that when he returned to the motel, he saw that room 217 had been reserved. He was shown a photograph of a vehicle that Investigator Reyes had previously identified as similar to the Dodge that Mr. Young was driving. Mr. Patel testified the car in the photograph was similar to the car that he saw in the parking lot.

Mr. Patel testified that the next day, housekeeping entered room 217 at noon following

the 11:00 a.m. check out time. Housekeeping then contacted Mr. Patel. He entered the room and saw blood and a body partially covered with a comforter. Mr. Patel called 911 and did not allow anyone to enter the room until the police arrived.

William Perez, the father of Carlos Perez, testified that in August 2003, he and Carlos were living in Wilton Manner, Florida. Carlos was nineteen years old and working for Dependable Temps, a temporary labor agency. Mr. Perez testified the last time he saw Carlos alive was the day before his death and heard him in the shower before leaving for work on the morning of his death. Carlos generally left for work at 5:00 a.m. and returned home at 4:30 p.m. or 5:00 p.m. Carlos did not own a vehicle and walked to work.

When Carlos did not return home after work the next day, Mr. Perez called Carlos' cell phone, but he did not answer. Mr. Perez waited up for him until midnight, but Carlos did not return. When Carlos was not still home the next morning, Mr. Perez called Carlos' best friend, but he had not heard from Carlos. Mr. Perez went to the Ft. Lauderdale Police Department and was directed to the Wilton Manner Police Department, where he was told that he had to wait forty-eight hours before filing a report. He returned before the forty-eight hours had expired and stayed at the police department until they accepted a report. Police officers later came to his employment and told him of Carlos' death.

Detective Dwyer, a crime scene investigator with the Melbourne Police Department, testified that on August 27, 2003, he was called to the Super 8 Motel in Melbourne for a death investigation and arrived at approximately 1:56 p.m. He was first directed downstairs to a southeast exterior door where he was shown a reddish stain on the door frame and on the carpet inside the area of the door. He tested the stains for blood, and the results were negative.

Detective Dwyer testified that before entering room 217, he processed the exterior part of the door using an alternative light source. He was able to lift a few latent prints from the door and metal door jam area. Upon entering the room, he conducted vacuum sweepings of the carpet area for hairs and fiber evidence. He also drew a diagram of the room.

Detective Dwyer said the victim was lying across the bed with his head pointed south. His body was covered with a comforter, and a pillow was over his head. Detective Dwyer took multiple photographs of the body. He also observed blood spatter on the south wall and on a night stand on the south side of the bed. He stated the blood spatter was consistent with the victim's wounds and the his position on the bed.

Detective Dwyer testified he used an alternative light source to scan the tile floor of the bathroom and observed footwear impressions. He used fingerprint powder and a

fiberglass brush to process them in the same way that fingerprints are processed. Detective Dwyer recovered four distinctive footwear impressions that were of a quality possible for identification. He also photographed the footwear impressions. The footwear impressions were logged into the property room and transferred to the FDLE for comparison. The detective said there also appeared to be some type of moisture on the floor that had dried.

Detective Dwyer processed the interior of the room for fingerprints and was able to raise fingerprints from the room. He was asked to compare the prints to Appellant, Mr. Young, Travis Smith, Johnny Owens, Kendall Rollie, Howard Williams, and Carlos Perez. He stated none of the fingerprints of these individuals matched the fingerprints lifted at the crime scene.

Detective Dwyer testified that while processing the scene for latent prints, he noticed there "were distinctive wipe down marks on the different items that we were processing for latent prints." He stated a wet cloth appeared to have been used to wipe down the objects in an attempt to destroy or remove any fingerprints. The pillow cases from the pillows that were on and underneath the victim's body were missing, and there were no towels or wash cloths in the bathroom. The victim's clothing and personal belongings were also missing. The detective admitted there was no evidence establishing that the cleaning was not done by the maid on the previous day.

On cross-examination, Detective Dwyer testified hairs were recovered from the vacuum. The FDLE was unable to process the hairs, so they were sent to the FBI, which had not yet released any results. Detective Dwyer stated he also collected hairs from the comforter, which were sent to the FLDE and compared to hairs of Appellant and Carlos Perez with negative results. He also stated a Caucasian head hair was found in the comforter that did not belong to Mr. Perez. After the victim's body was removed, Detective Dwyer collected hairs from the center of the bed that were identified by an analyst as belonging to an African American, but the hairs did not match Appellant's hair.

Detective Dwyer testified that during the autopsy of Mr. Perez, pubic hair and debris found in Mr. Perez's pubic hair were compared to Appellant's hair, and the results were negative. A swab of the victim's penis was taken and tested. The detective said the DNA profile from the swab did not match Appellant but was indicative of a female. Fluid was also found in the victim's anal cavity. Detective Dwyer stated the case possibly involved some type of sexual activity. He testified the DNA from a stain on either the comforter or the mattress top was identified as matching Harry Pope. The detectives, however, eliminated Mr. Pope as a suspect.

Detective Dwyer said the sides of the sheets and comforter covering Mr. Perez's body

were tucked into the mattress. The officer explained the sheet was not tucked underneath Mr. Perez tightly as if someone forced it underneath him but "was kind of meshed a little bit around him, where we didn't have to move the body to collect it." The officer also observed transferred blood stains both on the pillow underneath Mr. Perez and on top of his head. He stated the transferred stains indicated there was almost no movement of the body.

Detective Dwyer testified he collected five cigarette butts. Three were found in an ashtray on the end table next to the bed, and two were found on the floor underneath the headboard. The detective said the cigarette butts were tested, and the DNA matched Mr. Perez. One of the cigarette butts had a DNA profile that was indicative of a female.

Detective Lawson testified that at just after noon on August 27, 2003, he received a call that a male body had been found in one of the motel rooms at the Super 8 Motel and went to the scene. The detective said no identification was found on the victim or in the room. The motel clerk provided a registration card showing the room was registered to Carlos Perez and listing a Pennsylvania driver's license number. Officers discovered that prior to receiving a license in Pennsylvania, Mr. Perez had a license in Florida and was listed in the Florida Division of Motor Vehicles. They identified Mr. Perez through a photograph and information received from the FDMV. Officers learned from Mr. Perez's family that in July 2003, Mr. Perez had moved from Pennsylvania back to Florida to live with his father in Wilton Manner. Officers also learned that Mr. Perez's father had reported him missing.

Detective Lawson testified another detective informed him that a credit card belonging to a homicide victim in Bartlett, Tennessee, was used on Sunday, August 24, 2003, at a Speedway gas station located approximately five miles from the motel. The detective obtained a digital capture of the video of the credit card transaction and saw a white 1993 Lincoln. He said that on September 4 between 4:00 a.m. and 5:00 a.m., he and other officers went to Dependable Temps, where Mr. Perez had been employed. Upon arriving, Detective Lawson saw a white, four-door 1993 Lincoln Towncar parked in front of the entrance of the building. The detective said the tag number was "69BAM," a personalized tag that was not registered to any vehicle but the tag was registered to Appellant.

Detective Lawson said he and other officers showed photographs of Mr. Perez to several people at Dependable Temps who recognized Mr. Perez from the job site but were unable to provide additional information. When the officers left at around 8:00 a.m. or 8:30 a.m., the Lincoln was still parked outside of the building. When the officers returned that afternoon to obtain the VIN number off the windshield, the Lincoln was gone. The records of the temporary agency showed that Mr. Perez had signed in on August 26 at 5:00 a.m., but Appellant did not sign in that morning.

-39-

Detective Lawson testified that upon returning to Melbourne, he searched for information on Appellant and the Lincoln and learned that Appellant was also associated with a 1987 Dodge Aires K-car. He learned that on August 15, Appellant and another individual had been stopped in the Aires in Rockledge, Florida, a small town located five miles north of Melbourne. He further discovered the Aires was stopped on August 25 in Brevard County on I-95. He contacted Brevard County officers and learned that during the stop, Tevarus Young was arrested on an outstanding warrant. He also learned that on August 29 or 30, the tag number on the Aires had been run in Mississippi in areas that Bartlett police officers were tracking for the use of the stolen credit card. Bartlett police officers informed Detective Lawson that they had information leading them to believe Appellant had lived in Bartlett within a mile of the victims. Detective Massey came to Florida, and he and Detective Lawson compared their respective crime scenes.

Detective Lawson testified that on September 12, 2003, he and Detective Massey went to the Broward County Detention Center in Ft. Lauderdale to interview Mr. Young. Detective Lawson said Mr. Young was read his *Miranda* rights and talked to the detectives for a few hours. Mr. Young's initial demeanor was congenial and open, but his demeanor changed during the interview. Detective Lawson said Mr. Young "became emotionally upset, actually physically, violently upset, and throwing up, in the trash can, rolling on the floor, screaming, hollering, crying, banging his hands, trying to talk but unable to because he was crying so hard." Detective Lawson, Detective Massey, and Detective Bonnie Rink returned the next day to clarify a few issues. During the second interview, Mr. Young was more quiet and subdued. Detective Lawson testified they confronted Mr. Young because they did not feel he was being completely truthful about some things. Mr. Young again became emotionally upset, crying and vomiting. The story that Mr. Young provided the officers on the second day was not the same story he provided on the first day. During the first interview, the information that Mr. Young first provided differed from the information he provided at the end of the interview. Moreover, the information that Mr. Young provided to the officer during the beginning of the second interview differed from the information he provided them at the end of the second interview.

Detective Lawson testified he assisted the FDLE in obtaining search warrants on Appellant's automobiles. The officers attempted to serve the warrant at the address listed on Appellant's license. The roommate of Appellant's brother, Floyd Smith, advised the officers that Appellant did not live there but came by occasionally and left his car there. The officers seized Appellant's Lincoln at that location. The Aires was also located and seized.

Detective Lawson stated he and Detective Rink interviewed Appellant following his arrest. Appellant was advised of his *Miranda* rights and agreed to talk to the officers. Appellant did not admit to the Bartlett homicides or the Perez homicide. Appellant admitted

he knew Mr. Perez from Dependable Temps and stated he saw Mr. Perez at work a few times. Appellant told officers that he and Mr. Perez got together after work. Detective Lawson said "it sounded like [they] went and purchased some powdered cocaine." Appellant denied any contact with Mr. Perez on the day that Mr. Perez checked into the Super 8 Motel.

Detective Lawson testified Appellant explained he had purchased the Lincoln in Mississippi a few weeks before he picked up the car. Appellant said Mr. Young helped him get the car back down to Florida. He admitted Mr. Perez had been in both the Aires and the Lincoln. According to Appellant, after he returned to Ft. Lauderdale following Mr. Young's arrest, he asked his brother to help him retrieve the Aires, but his brother was unable to do so. Appellant told officers that he then purchased a bus ticket for Tuesday, August 26, at 9:00 a.m. from Ft. Lauderdale to Melbourne. Detective Lawson stated he contacted Greyhound Bus Lines and discovered that Appellant had purchased the bus ticket on August 27, the day in which Mr. Perez's body was found. The copy of the ticket was found in Appellant's belongings following the seizure of his vehicles.

On cross-examination, Detective Lawson testified drug trafficking was known to occur at the motel where Mr. Perez was found. He stated he also believed that the offense involved sexual conduct. Mr. Perez's hands were not behind his back. Detective Lawson said he believed someone had positioned Mr. Perez's hands and legs, which were spread. He stated the anal opening appeared to be wider than he would have expected. He acknowledged the medical examiner who performed the autopsy reported fresh nicks in the anal opening. A petroleum substance was found in the opening, and petroleum jelly was found in the truck of Appellant's car. DNA test results from a substance found on the the victim'e penis was consistent with female DNA.

Special Agent Davis testified that on September 16, 1993, he assisted in the execution of a search warrant on a white Lincoln Towncar with the licence plate of 69BAM. He was present during the search of the car and seizure of items found in it. A pair of Nike shoes was found in the upper level of the trunk of the car. The shoes were submitted to crime analyst Emily Strickland for footwear comparison.

Ms. Strickland testified that in 2003, she was employed as a crime laboratory analyst with the FDLE and was assigned to the latent prints section where she compared footwear impressions and latent print impressions. The trial court admitted Ms. Strickland as an expert in footwear impression comparisons. Ms. Strickland was asked to compare a pair of Nike tennis shoes seized by the FDLE with a latent print obtained from the Melbourne Police Department.

Ms. Strickland testified her first task upon receiving negatives of photographs from the scene was to enlarge them on a scale of one to one. She also made test impressions from the footwear that she received by inking the bottom of the shoes, placing a large sticker on the bottom of the shoe, peeling off the sticker, and putting it on a piece of clear acetate. She used the test impression as an overlay. Ms. Strickland stated that in this case, she prepared the acetates from the tennis shoes. She compared the test impression to the photographs of the footwear impression that she had enlarged from thirty-five millimeter negatives, as well as lifts taken from the crime scene.

Ms. Strickland determined the shoes and the latent prints from the crime scene were of the same size, shape, and style. She found an individual characteristic in both the shoe and the latent prints that looked like a finger. She measured the "finger" on both and found they were the same size and in the same location. Ms. Strickland explained an individual characteristic typically resulted from wear and made the shoe unique. In the left shoe, Ms. Strickland found an individual characteristic caused by wear that matched the latent prints. This individual characteristic was located just past the arch toward the middle edge of the shoe.

Ms. Strickland testified she detailed in her initial report the footwear impressions that "could have been made" by the shoes. After further analysis, however, she concluded that one of the footwear impression was "most likely made" by the shoes.

Dr. Qaiser, who was admitted by the trial court as an expert in forensic pathology, testified he performed an autopsy on Mr. Perez. The doctor opined the cause of death was ligature strangulation and incisions to the neck and that the manner of death was homicide.

Dr. Qaiser testified Mr. Perez had a ligature mark that almost encircled his neck from anterior to posterior. As further evidence of strangulation, he observed petechiae on the eyelids, the face surrounding the eye, and within the palpable conjunctiva or the inner side of the eyelids. Dr. Qaiser stated that although the hyoid bone was intact, ligature strangulation does not cause the hyoid bone to break.

Dr. Qaiser testified there were multiple incised wounds to the neck, some of which were "way deep" and cut through the blood vessels, the thick skeletal muscle, the windpipe, and to the bone of the spine. He noted seven to eight incisions to the neck that were one to two inches deep and seven to twelve inches long. The internal jugular vein, a major blood vessel, was cut. Other blood vessels were also cut and collapsed due to the loss of blood. He noted that the lungs showed a blotchy discoloration and that the entire tracheal bronchial tree was lined with aspirated blood. He stated that while the incisions were being made, blood was both aspirated and ingested.

Dr. Qaiser testified regarding evidence of ligatures, including residue of applied tape on both wrists. He also found abrasions or bruises in correlation with the adhesive marks on the wrists. He noted furrows resulting from the application of the ligature around the wrist. He found an abrasion on the right wrist close to the adhesion from the tape. Dr. Qaiser classified the abrasion as postmortem and said it likely occurred while the ligatures were being loosened.

Dr. Qaiser stated he examined the anal area for evidence of sexual abuse. He found fresh abrasions approximately one quarter inch in size at the eleven o'clock and one o'clock positions on the walls of the anal aperture between the mucocutaneous junction. He also found fifteen to twenty cubic centimeters of a "grayish white thick fluid substance."

On cross-examination, Dr. Qaiser testified to observing superficial furrows around the area of the ankles in addition to those on the wrists. He stated the furrows on the ankles were homogenous in width and throughout the circumference of the ankles. He did not see any evidence of an adhesive substance on the skin of the ankles or any bruising, scratching, or tearing of the skin on the ankles from attempts to escape. Dr. Qaiser observed an area on the victim's back that was consistent with a bite mark. He said the victim also had marijuana in his system.

Dr. Qaiser described conjunctival petechiae as a "very strong" finding in cases of strangulation. The doctor said asphyxia did not cause the petechiae. Rather, when the neck compressed, the pressure caused the blood to rise in the blood vessels, and the vessels leak or puncture. Dr. Qaiser testified that although the whites of the eyes did not show hemorrhaging, this was not inconsistent with a finding of conjunctival petechiae as petechiae can occur outside of the eyelids alone.

## B. Trial Court's Findings

Following an evidentiary hearing, the trial court entered an order on August 29, 2008, finding that the evidence of the Perez homicide met the initial requirements for admission as a common scheme or plan. Specifically, the trial court found that the method of commission of the Perez homicide established a unique modus operandi and led to the inference that the perpetrator of the Perez homicide was the perpetrator of the James homicides. The lower court found that the Perez and James homicides were closely linked in time and that the investigations significantly overlapped. The lower court also found that the proof supporting the proposition that Appellant was the perpetrator of the Perez homicide was clear and convincing. The trial court held a ruling upon whether identity would be a material issue in abeyance until evidence was presented at trial.

The trial court found a similar methodology existed in both cases, as well as with the homicide of Keith Gross, which the trial court ultimately held to be inadmissible. The lower court noted:

Keith Gross, Clarence and Lillian James, and Carlos Perez all suffered from multiple incised wounds to the neck; their hands and/or feet bore evidence of binding; at least two of the victims suffered from strangulation and the other two victims bore evidence of strangulation but the wounds to their neck made it difficult to ascertain whether strangulation actually occurred; three of the four victims were found either partially unclothed or completely nude; the victims were each found face down; at each of the scenes it appears that the perpetrator attempted to "wipe down" the scene or "clean" the scene after the murder; and it appears each of the victim's may have known their attacker.[1]

The trial court found that while Mr. Perez was a young male who showed signs of recent sexual activity and Mr. and Mrs. James were two elderly victims who did not appear to have been sexually assaulted, the method in which the victims were killed were sufficiently unique to establish a signature modus operandi. The court noted that any differences in the victimology of the offenses should not circumvent the application of the exception.

The trial court found that if the issue of identity was contested at trial, evidence that Appellant committed other similarly unique crimes would be relevant to the issue of identity and its probative value would likely outweigh any prejudice to Appellant. The lower court noted:

This is particularly true of the Perez murder, since Young, the accomplice in the James murders, was incarcerated at the time of the commission of that crime and the crime occurred shortly after the James murders; thereby, rebutting the implication, which may be raised by the defense, that it was Young and not Appellant who committed the James murders.

The lower court also noted the State would likely rely heavily upon the testimony of Mr. Young, as the accomplice, to support their assertion that Appellant killed Mr. and Mrs. James. Based upon defense counsel's cross-examination of Mr. Young during the evidentiary hearing, the trial court found Appellant would likely challenge the State's theory

---

[1] The trial court did not specify which of the two victims suffered from strangulation and which of the two victims bore evidence of strangulation. However, as the trial court noted, Dr. Joshua Perper, who performed the autopsy on Mr. Gross, testified that due to the deep slashing wounds on Mr. Gross' neck, he could not determine whether there was a ligature mark on Mr. Gross' neck that would indicate strangulation.

at trial. As a result, identity would likely be a material issue, and the probative value of the Perez homicide would be significant. If so, the State would be allowed to show that another murder with the same modus operandi was committed a few days after the murders of Mr. and Mrs. James at a time when Mr. Young was in jail.

The trial court found that evidence of the Perez homicide was even more probative due to its "nearly inextricable investigative connection to the instant murder." The court explained that the investigation and discovery of Appellant and his vehicle occurred as a result of Florida officers' investigation of Mr. Perez's homicide and that they began their investigation of Appellant based upon information provided by Bartlett officers. The discovery of Appellant's car was directly related to information provided by Bartlett officers. Florida officers executed the search warrant of Appellant's vehicle in the course of their investigation of Mr. Perez's homicide and in cooperation with Bartlett officers. The trial court found it was the direct result of this cooperation that led both agencies to link Appellant to the respective homicides. Thus, the trial court found that in addition of proving identity, "it may be necessary to admit at least portions of proof, relating to the Perez murder, in order to create a complete picture for the jury of the investigation conducted by the Bartlett authorities."

The trial court also found the proof clearly and convincingly established that Appellant committed the Perez homicide. In examining the evidence offered in support of the Perez homicide, the trial court noted:

> The Florida authorities testified that a shoe print found at the scene of the Perez murder matched tennis shoes found in the trunk of Appellant's vehicle. The witness testified that the shoes had distinctive wear patterns that were identical to those found in the crime scene print. Additionally, Appellant worked for the same employment agency from which Perez disappeared and it was later discovered that Appellant and Perez knew each other. Moreover, other additional evidence places Appellant in the area at the time of the murder.

The trial court found it was not in a position to determine the probative value of the evidence as it was unclear if or to what extent identity would be challenged at trial. The court explained it was also unclear what evidence, in addition to the testimony of Mr. Young, that the State may offer at trial in support of their position that Appellant killed Mr. and Mrs. James. The lower court found that if Mr. Young's testimony was vigorously challenged at trial, the probative value of evidence of the Perez homicide would increase. If the issue of

identity was conceded or left largely unchallenged or if the evidence of identity was overwhelming, the probative value of the Perez homicide would be slight.

During trial, the trial court found that identity was a material issue and that the probative value of the evidence of Mr. Perez's homicide was not substantially outweighed by the prejudice to Appellant. The trial court then allowed the State to present evidence of Mr. Perez's homicide. Before allowing the State to present such evidence, the trial court instructed the jury a follows:

> Jurors, the State at this time intends to present proof regarding another crime or crimes allegedly committed by Appellant other than that which he's on trial for, and you may not consider such evidence to prove his disposition to commit such a crime on this case here.

> This evidence may only be considered by you for the limited purpose of determining whether it proves proof of defendant's identity, that is, such evidence may be considered by you if it tends to establish Appellant's identity in the case on trial.

## C. Analysis

Rule 404(b), Tennessee Rules of Evidence, provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The rationale behind the general rule of inadmissibility in Rule 404(b) is that the admission

of evidence of other wrongs poses a substantial risk that the trier of fact may convict the defendant based upon the defendant's bad character or propensity to commit criminal offenses, rather than upon the strength of the evidence of guilt on the specific offense for which the defendant is on trial. *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008); *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002).

Evidence of other crimes, wrongs, or acts may be admitted as relevant to issues of "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404(b), Advisory Comm. Cmts; *see Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980). To minimize the risk of unfair prejudice in the introduction of evidence of other acts, however, Rule 404(b) establishes protective procedures that must be followed before the evidence is admissible. *See* Tenn. R. Evid. 404(b); *James*, 81 S.W.3d at 758. Upon request, the trial court must hold a hearing outside the jury's presence to determine whether the evidence of the other acts is relevant to prove a material issue other than the character of the defendant. *James*, 81 S.W.3d at 758. The trial court must state on the record the specific issue to which the evidence is relevant and find the evidence of the other crime or act to be clear and convincing. *Id.* If the trial court substantially follows the procedures in Rule 404(b), the court's decision will be given great deference on appeal and will be reversed only if the trial court abused its discretion. *Id.*

In the present case, the trial court conducted an evidentiary hearing prior to trial and found that evidence of the murder of Carlos Perez was relevant on the issue of identity and that Appellant's commission of the murder was established by clear and convincing evidence. After the State presented evidence at trial supporting its theory that Appellant killed Mr. and Mrs. James and defense counsel cross-examined the witnesses, the trial court found that identity was at issue and that the danger of unfair prejudice of the admission of the evidence of Mr. Perez's murder did not outweigh its probative value. We conclude the trial court substantially followed the procedures in Rule 404(b) in admitting the evidence of the subsequent death of Carlos Perez. Therefore, we must give great deference to the trial court's decision to admit the evidence, and the trial court decision will be reversed only if the court abused its discretion. *See James*, 81 S.W.3d at 758. Because the term "discretion" essentially "denotes the absence of a hard and fast rule," we will reverse a decision to admit evidence "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quotations omitted).

### 1. Identity

In allowing the State to introduce evidence of Carlos Perez's murder, the trial court found that the evidence was relevant to the issue of identity. Identity was clearly an issue at

trial. Appellant challenged the State's proof that he killed Mr. and Mrs. James. Defense counsel maintained in his opening statement that Appellant did not commit the offenses. The defense identified others who were seen in the area at the time of the victims' death. Defense counsel questioned Mr. Young extensively on cross-examination regarding his recollection of the events and his prior statements to the police and suggested that Mr. Young killed the victims.

The trial court admitted evidence of Mr. Perez's murder based upon the distinctive design of his murder and the murders of Mr. and Mrs. James. In order for multiple offenses to constitute a distinctive design and give rise to an inference of identity, the modus operandi employed must be unique and distinctive such that it is like a signature. *Id.* at 248; *(*quoting *State v. Carter*, 714 S.W.2d 241, 245 (Tenn. 1986)). The offenses need not be identical in all respects, but the methods used in committing the offenses must have "'such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons.'" *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999) (quoting *Harris v. State*, 227 S.W.2d 8, 11 (Tenn. 1950)). In other words, "the modus operandi of the other crime and of the crime on trial must be substantially identical and *must be so unique* that proof that the defendant committed the other offense fairly tends to establish that he also committed the offenses with which he is charged." *Id*. (quoting *Bunch*, 605 S.W.2d at 230) (emphasis in original).

The trial court must examine whether a distinctive method was used to commit the offenses and not whether the evidence shows that the defendant committed the offenses. *Id*.; *Shirley*, 6 S.W.3d at 250. A proper analysis also includes more than merely weighing the similarities and differences of the offenses. *Moore*, 6 S.W.3d at 241. Rather, the trial court must find that a distinctive design or unique method was utilized in committing the offenses. *Id.*

In examining whether the offenses constituted a distinctive design, we note that all the victims were bound, strangled, and had multiple incisions to their necks. Clothing was removed from Mrs. James and Mr. Perez, and they were found lying face down. The victims' bindings were removed; the crime scenes were cleaned; and items were taken from the victims. Dr. Smith testified the number of homicides involving this methodology was small.

Appellant identifies differences in the homicides in support of his contention that the offenses are not distinctive. Courts, however, must not merely enumerate the similarities and differences of the offenses but must examine the methods used to commit the offenses. *See Shirley*, 6 S.W.3d at 248. We conclude that the modus operandi employed in the homicides was substantially identical and unique in that a reasonable person could conclude that the

offenses likely would not have been committed by different people.

## 2. Clear and Convincing Evidence

To be admissible, proof of the other crime, wrong, or act must be clear and convincing. Tenn. R. Evid. 404(b). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.w.2d 240, 245 (Tenn. Crim. App. 2005). The clear and convincing standard is more exacting than the preponderance of the evidence standard but does not require certainty mandated by the beyond a reasonable doubt standard. *Hughes v. Bd. of Prof'l Resp.*, 259 S.W.3d 631, 642 (Tenn. 2008).

The evidence presented at the pretrial hearing established that on August 25, 2003, Appellant was driving a white Lincoln that he had recently purchased in Mississippi and that Mr. Young was following him in Appellant's Dodge Aires. Sometime after 1:00 p.m., Officer Reyes stopped Mr. Young on the interstate near Melbourne, Florida, and arrested him. Officer Reyes instructed Appellant to leave the scene while officers processed Mr. Young and to return for the Dodge Aires after processing was completed. Appellant did not return for the car that day but returned to Ft. Lauderdale. The officer left the Dodge parked on the side of the interstate located approximately five miles from the Super 8 Motel in Melbourne and approximately two and one-half hours away from Ft. Lauderdale. As a result, Appellant needed someone to accompany him to Ft. Lauderdale to retrieve the Dodge.

Appellant and Mr. Perez worked together at Dependable Temps in Ft. Lauderdale and associated with each other outside of work. Mr. Perez's father last saw him on the morning of August 26, 2003. Mr. Perez checked into the Super 8 Motel between noon and 1:00 p.m. that same day and arrived with a skinny African American male in a car similar to Appellant's Dodge Aires. Mr. Perez did not own a vehicle. His body was discovered in the motel room the following day.

Appellant admitted to police that Mr. Perez had been in both the Dodge Aires and the Lincoln. The evidence establishes that Appellant did not return to Ft. Lauderdale from Bartlett until the afternoon of August 25 at the earliest. Appellant also admitted to being in Melbourne on August 26 and claimed he took a bus to Melbourne that morning to retrieve his Dodge Aires. Detective Lawson, however, testified Appellant actually purchased the bus ticket on August 27, the day Mr. Perez's body was discovered.

Evidence also places Appellant at the motel room. Officers collected shoe impressions from the bathroom floor in the motel room and seized a pair of tennis shoes from the trunk of Appellant's Lincoln. Testing revealed the shoes and the impressions were of the

same size, shape, and style. Ms. Strickland found individual characteristics in the shoes matching the impressions. She concluded that some of the footwear impressions could have been made by the shoes and one footwear impression was likely made by the shoes.

The State urges this Court to consider FBI Agent Catherine Theisen's testimony at trial in determining whether there was clear and convincing evidence that Appellant killed Mr. Perez. At trial, Agent Theisen testified she compared the mitochondrial DNA in pubic hair collected from the motel room to a known sample from Appellant and could not exclude Appellant as the source of the hair. Agent Theisen, however, did not testify at the pretrial hearing or during any jury out hearing at trial. Because the trial court must base its finding upon "evidence heard outside the jury's presence," we decline to consider evidence that had not been presented to the trial court at the time it made its decision in determining whether the trial court abused its discretion in finding that the evidence met the clear and convincing standard. *See State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997).[2]

We note that the issue of whether the State established by clear and convincing evidence that Appellant killed Mr. Perez is close. Because the trial court followed the requirements provided in Tennessee Rule of Evidence 404(b), our review on appeal is limited to an abuse of discretion standard. After reviewing the evidence presented, we cannot conclude that the trial court abused its discretion in finding that the evidence presented at the pretrial hearing clearly and convincingly established that Appellant killed Mr. Perez.

### 3. Probative Value

The trial court must exclude evidence of the bad act "if its probative value is outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b)(4). The balancing test in Rule 404(b)(4) is more restrictive than the balancing test in Rule 403, which requires the evidence be excluded if the probative value is "substantially" outweighed by several dangers, including unfair prejudice. *See James*, 81 S.W.3d at 758 n. 6. Rule 404(b) is a "rule of exclusion" and excludes evidence on a more frequent basis than the test in Rule 403. *See id.*; (quoting *State v. Rounsaville*, 701 S.W.2d 817, 820 (Tenn. 1985).

Evidence of Mr. Perez's murder was probative of the issue of identity as the modus operandi of Mr. Perez's death and the deaths of Mr. and Mrs. James were substantially similar. The evidence also countered Appellant's defense at the trial suggesting that Mr. Young or James White killed Mr. and Mrs. James. Mr. Perez was killed while Mr. Young

---

[2] We note that if the trial court had failed to comply with the procedures in Rule 404(b), we would be required to determine admissibility "on the evidence presented at the jury out hearing." *Dubose*, 953 S.W.2d at 653.

-50-

was in jail. Mr. White testified at trial that he did not own a vehicle, and no evidence was presented suggesting that Mr. White was in Florida when Mr. Perez was killed.

The trial court also instructed the jury that evidence of Mr. Perez's homicide could only be considered in identifying the perpetrator in the homicides of Mr. and Mrs. James. Jurors are presumed to follow the instructions of the trial court. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). During closing arguments, the prosecutor also explained to the jury that they could consider the evidence only in identifying the perpetrator. While evidence of Mr. Perez's homicide carried some prejudice, we conclude the trial court did not abuse its discretion in finding that the probative value of the evidence outweighed its prejudicial effect. The trial court properly admitted evidence of the subsequent homicide at trial.

## II. SUFFICIENCY OF THE EVIDENCE

Appellant maintains the evidence is insufficient to support his convictions. A verdict of guilty, rendered by a jury and approved by the trial court, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.*

This Court must consider whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). We may not substitute our own inferences for those drawn by the trier of fact from circumstantial evidence. *Matthews*, 805 S.W.2d at 779. Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Appellant was convicted of two counts of premeditated first degree murder and two counts of felony murder in the perpetration of a robbery for the deaths of Mr. and Mrs. James. Premeditated first degree murder is the "premeditated and intentional killing of

another." T.C.A. § 39-13-202(a)(1). Felony murder includes that "killing of another committed in the perpetration of or attempt to perpetrate . . . [a] robbery." *Id.* at (a)(2). Robbery is the "intentional or knowing theft of property from the person of another by violence or by putting the person in fear." T.C.A. § 39-13-401(a). Appellant does not contend that the State failed to produce evidence sufficient to establish all of the elements of the offenses of felony murder and premeditated first degree murder. Rather, he challenges the sufficiency of the evidence identifying him as the perpetrator and corroborating the testimony of Mr. Young as an accomplice.

Mr. Young testified in detail at trial regarding Appellant's robbing and killing the victims, as well as his actions prior to and following the homicides. The trial court did not instruct the jury that Mr. Young was an accomplice. Rather, the trial court instructed the jury that it must determine whether Mr. Young was an accomplice and that if so, whether the evidence was sufficient to corroborate his testimony that Appellant killed the victims. An accomplice "is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004) (Citing *State v. Lewis*, 35 S.W.3d 88, 94 (Tenn. Crim. App. 2000); *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). A witness is not an accomplice by merely possessing guilty knowledge, being morally delinquent, or participating in a distinct but related offense. *Id.* A witness is an accomplice if the witness could have been convicted of the offense. *Id.* We conclude that Mr. Young's admitted participation in the offenses was sufficient to render him an accomplice in the murders of Mr. and Mrs. James

Convictions may not be based solely upon the uncorroborated testimony of an accomplice. *See State v. Robinson*, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). Tennessee law, however, requires only a modicum of evidence to sufficiently corroborate such testimony. *See State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). The law in Tennessee regarding accomplice testimony has been described as follows:

> The rule, simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (*superceded by statute in unrelated grounds*, T.C.A. § 39-13-204(c) (1998)) (citations omitted). "Only slight circumstances are required to corroborate an accomplice's testimony." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Whether sufficient corroboration exists is a determination for the jury. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

The State presented extensive evidence at trial establishing Appellant's guilt and corroborating Mr. Young's testimony. Wesley and Diane Armstrong confirmed that Appellant visited them in August 2003 and was accompanied by a skinny African-American male with braids. Mr. Armstrong said that he saw Appellant and the man at Burger King where he was working and that he gave them food.

Mr. James was last seen alive on August 22, 2003, at approximately 1:00 p.m. when Mr. Stallion saw him sitting on the edge of his garage with two African-American men. Mrs. James did not go to work that evening, and the victims' bodies were discovered the next day. Mr. Young testified Appellant used the victims' credit card to purchase gas shortly after killing them. Records confirmed that Mrs. James' credit card was used at a Citgo gas station on Sycamore Lane in Memphis at 3:18 p.m. on August 22, within a few hours of Mr. Stallion seeing Mr. James with the two men.

Dr. Smith confirmed Mr. Young's testimony regarding the victims' injuries and the manner in which they were killed. He testified the victims were strangled and suffered multiple knife wounds to their throats. He identified evidence of bindings on the victims that were later removed. He also identified evidence consistent with the removal of Mrs. James' rings from her fingers by force.

Mr. Smith verified Mr. Young's testimony regarding Appellant's purchase of the Lincoln. Mrs. James' credit card was used at gas stations in Mississippi and Melbourne, Florida from August 22 to August 24, 2003, which was consistent with Mr. Young's testimony of their journey. Surveillance footage from a gas station in Batesville, Mississippi showed a Dodge Aires K-car near the pumps at the time Mrs. James' credit card was used. Surveillance footage from a gas station in Madison, Mississippi, showed an African-American male exit a Lincoln at the time that Mrs. James' credit card was used wearing a yellow shirt similar to the shirt that Mr. Young testified Appellant had purchased at J.C. Penney. When the man drove away in the Lincoln, he was followed by a Dodge Aires K-car.

Officer Reyes confirmed Mr. Young's testimony regarding the traffic stop and his arrest. The officer testified Appellant drove up in a Lincoln during the stop and identified the Dodge Aires that Mr. Young was driving as his vehicle. Officers later searched

Appellant's Lincoln and found a J.C. Penney bag in the trunk and a woman's ring underneath the back seat. Ms. Coleman identified the ring as belonging to Mrs. James.

Evidence was also presented regarding the homicide of Carlos Perez, which occurred a few days later and had a substantially similar modus operandi. This homicide occurred while Mr. Young was incarcerated. Such evidence was properly admitted on the issue of identity. We conclude this evidence is sufficient to corroborate Mr. Young's testimony and to establish Appellant as the perpetrator. Accordingly, Appellant is not entitled to relief regarding this issue.

### III. ADMISSION OF PHOTOGRAPHS AND CRIME SCENE VIDEO

Appellant asserts the trial court erred in admitting photographs of Mr. and Mrs. James taken at the scene and during their autopsies, a video of the crime scene, and photographs of Mr. Perez taken during his autopsy. The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial court, and the court's ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. *State v. Carruthers*, 35 S.W.3d 516, 576-77 (Tenn. 2000); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). As our supreme court stated in *Carruthers*, the modern trend is to vest more discretion in the trial court's rulings on admissibility. *Carruthers*, 35 S.W.3d at 577 (citing *Banks*, 564 S.W.2d at 949).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. *Carruthers*, 35 S.W.3d at 577. The court must still determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. *Id.* The term "undue prejudice" has been defined "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 950-51. (quoting Fed. R. Evid. 403, Advisory Comm. Notes).

In *Banks*, our supreme court provided the trial courts with guidance for determining the admissibility of relevant photographic evidence. The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Banks*, 564 S.W.2d at 951.

## A.  Photographs of the Victims from the Crime Scene

At trial, Appellant objected to the introduction of a photograph of Mrs. James and a photograph of Mr. James as they looked when Officer Devers, the first responding officer, discovered them at the scene.  During a bench conference and after Appellant had objected to the photograph of Mrs. James, the prosecutor argued that the photograph supported their theory of the offense, was not inflammatory, corroborated the testimony of Officer Devers, and laid the foundation for proof of other crimes.  The trial court admitted the photographs into evidence finding that the photographs were not inflammatory or gruesome, were necessary for the jury to make its determination, and would not mislead or confuse the jury.  The court also found the probative value of the photographs were not substantially outweighed by the danger of unfair prejudice.

The photographs supported Officer Devers' testimony describing the condition of the victims when he found them.  They were also relevant to the issue of identity as they illustrated the similarities between the murders of Mr. and Mrs. James and the murder of Carlos Perez.  The photographs were not particularly gruesome, and the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice, misleading of the jury, or confusion of the issues.  The trial court did not abuse its discretion in admitting the photographs.

## B.  Autopsy Photographs of the Victim

Prior to Dr. Smith's testimony at trial, defense counsel objected to the autopsy photographs of the victims as overly prejudicial and cumulative. During a bench conference, the prosecutor presented four photographs of Mr. James that he planned to introduce.  These photographs included a close-up photograph of Mr. James' eye, one photograph of a laceration on his arm, and two photographs of lacerations on his neck.  Defense counsel did not object to the photograph of the arm.  The prosecutor maintained the photographs of Mr. James' neck wounds were necessary to establish a signature crime.  The trial court admitted the photographs finding they were necessary for the jury to "determine whatever they're going to determine in this case."

The prosecution also sought to introduce three photographs of lacerations on different areas of Mrs. James' neck, a photograph of her eye, a photograph of a laceration on her forearm, a photograph of a laceration on her wrist, and a photograph of pressure marks on her ring finger. Defense counsel did not object to the admission of the photographs of Mrs. James' finger, forearm, and wrist. The trial court found the photographs were admissible and relevant to the issues to be determined by the jury.

During Dr. Smith's testimony, he referred to two photographs of Mr. James' neck to illustrate the multiple incised wounds and the stab wound. He used photographs of the victims' eyes to demonstrate petechical hemorrhages which indicated strangulation. Dr. Smith referred to two photographs of Mrs. James' neck to illustrate the incised wounds to the front and side of her neck. He also used a photograph of the back of her neck to demonstrate the length and extent of the wound.

Photographs of the nature and extent of the victims' injuries were relevant to the issue of premeditation and to illustrate the similarities between these murders and the murder of Carlos Perez. The photographs assisted Dr. Smith in his testimony regarding the injuries. Although the photographs are unpleasant to view, we conclude that the probative value of the photographs is not substantially outweighed by their prejudicial effect and that the trial court did not abuse its discretion in allowing their admission.

### C. Video of the Crime Scene

During Captain Schaber's testimony, the prosecution sought to introduce a videotape of the crime scene. Defense counsel objected arguing that the video was cumulative, "overly inflammatory," and unfairly prejudicial. The prosecutor maintained that the videotape was being introduced to show the layout of the rooms and that the view of the victims' bodies was minimal. The trial court allowed the jury to view the video.

The admissibility of a videotape of a crime scene is within the trial court's sound discretion, and the court's ruling on the admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. *Van Tran*, 864 S.W.2d at 477. The video corroborated Mr. Young's testimony regarding the layout of the house and where the victims were killed, as well as the testimony of the officers. The portion of the video showing the victims' bodies was not overly inflammatory.

While the videotape and the other evidence admitted may have included some of the same material, admission of the videotape was not error. *See Bigbee*, 885 S.W.2d at 807 (concluding no error in admitting a videotape of the crime scene even though it depicted images similar to those of photographs admitted). Each of the different forms of evidence admitted served different purposes and were relevant to the issues to be decided by the jury. The probative value of the video is not substantially outweighed by the danger of unfair prejudice. Therefore, the trial court did not abuse its discretion in admitting the videotape into evidence.

## D. Crime Scene Photographs of Carlos Perez

The prosecutor sought to introduce three crime scene photographs of Mr. Perez during the testimony of Officer Dwyer. Defense counsel objected to the admission of the photographs and argued that they were overly prejudicial and cumulative. The prosecutor responded that the photographs were relevant to show the similarities between the two crime scenes, Appellant's identity as the perpetrator, and how the crime scene was processed. The trial court agreed that the photographs were relevant to illustrate the similarities between the offenses. The court allowed the prosecution to introduce two of the three photographs. One of the photographs was of Mr. Perez lying face-down on the bed without any clothing and a pillow over his head, and the second photograph was of Mr. Perez with the pillow removed.

We note that Appellant failed to reference the record or offer any argument in his brief regarding these photographs. *See* Tenn. R. App. P. 10(b) (providing that an issue is waived on appeal if the defendant fails to support the issue with argument, citation to authorities, or appropriate references to the record). Regardless of waiver, Appellant is not entitled to relief. The photographs were relevant to illustrate the similarities between the murders, and the probative value of the photographs is not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court properly exercised its discretion in admitting the photographs.

## E. Autopsy Photographs of Carlos Perez

Prior to Dr. Qaiser's testimony at trial, defense counsel objected to the introduction of four photographs arguing that they were graphic and overly prejudicial and that two of the photographs were cumulative. The photographs were of Mr. Perez's full body, the back of his neck, his body on its side with a view of the back of his neck, and a close-up of the injuries to his neck. The prosecutor stated he had twenty-five to thirty photographs of Mr. Perez that he had narrowed down to four. He maintained the photograph showing the close-up view of Mr. Perez's neck injury was necessary to demonstrate the similarities of the incised wounds of all the victims. He also maintained the other photographs showed the ligature marks, including one which spanned to the back of Mr. Perez's neck. The trial court found the photographs were relevant to demonstrate the similarities in the murders and were, therefore, admissible.

During Dr. Qaiser's testimony, the State did not present the photograph of Mr. Perez lying on his side. Dr. Qaiser used the photograph of Mr. Perez's body to identify various injuries to the jury and referred to the other two photographs in testifying with regard to the severity of Mr. Perez's injuries. These photographs were relevant to show the similar

methods by which Mr. Perez, Mr. James, and Mrs. James were killed. The probative value of the photographs is not substantially outweighed by their prejudicial effect. We, therefore, conclude that the trial court properly exercised its discretion in admitting the photographs.

## IV. CONSTITUTIONALITY OF THE DEATH PENALTY

Appellant maintains that the trial court erred in denying his motion to declare Tennessee's first degree murder sentencing statute unconstitutional. He challenges the constitutionality of Tennessee Code Annotated section 39-13-204(g)(1), which provides that the sentence "shall be death" if the State proves any aggravating circumstances beyond a reasonable doubt and if the aggravating circumstances outweigh the mitigating circumstances. Appellant contends this provision unconstitutionally shifts the burden of proof to the defendant to establish that the aggravating circumstances are not outweighed by the mitigating circumstances. This argument has been addressed and rejected by the Tennessee Supreme Court. *See State v. Howell*, 868 S.W.2d 238, 258 (Tenn. 1993); *State v. Bane*, 853 S.W.2d 483, 488-89 (Tenn. 1993). Appellant is not entitled to relief regarding this issue.

## V. MANDATORY REVIEW

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tennessee Code Annotated section 39-13-206(c)(1) requires this Court to review the record to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

### A. Manner in Which Death Sentences Were Imposed

In accordance with its instructions, the jury unanimously determined that the State proved beyond a reasonable doubt that several aggravating circumstances applied to each of the murders committed by Appellant and that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The record reveals that the sentencing hearing was conducted pursuant to the applicable statutory provisions and the

rules of criminal procedure. We conclude Appellant's sentences of death were not imposed in an arbitrary fashion.

## B. Evidence Supporting Aggravating Circumstances

In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, we must view the evidence in the light most favorable to the State and determine whether a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. *State v. Rollins*, 188 S.W.3d 553, 571 (Tenn. 2006).

The jury concluded that the State successful proved four statutory aggravating circumstances with regard to the murder of Mrs. James: (1) that "[t]he defendant was previously convicted of one (1) of more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" (2) that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" (3) that "[t]he murder was committed for the purpose of avoiding, interfering with , or preventing a lawful arrest or prosecution of the defendant or another;" and (4) that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder . . . [or] robbery. . . ." *See* T.C.A. 39-13-204(i)(2), (5), (6), (7). The jury concluded the State successfully proved the same four statutory aggravating circumstances with regard to the murder of Mr. James, as well as an additional statutory aggravating circumstances, that "[t]he victim of the murder was seventy (70) years of age or older." *See id.* at (i)(14).

### (i)(2): Prior Violent Felony Convictions

During the penalty phase, the parties stipulated that Appellant had previously been convicted of the following offenses in Broward County, Florida: two counts of battery on a law enforcement officer on March 29, 1982; aggravated burglary on April 23, 1982; and robbery and kidnapping on July 21, 1982. The parties also stipulated that these felony convictions constituted crimes of violence against the person. These stipulations are sufficient to establish that Appellant "was previously convicted of one (1) or more felonies, other than the present charge, which involve the use of violence to the person," under section 39-13-204(i)(2).

## (i)(5): Heinous, Atrocious, or Cruel

The State also established beyond a reasonable doubt that the murders of the victims were "especially heinous, atrocious, or cruel in that [they] involved torture or serious physical abuse beyond that necessary to produce death." *See* T.C.A. § 39-13-204(i)(5). Torture has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *State v. Rollins*, 188 S.W.3d 553, 572 (Tenn. 2006) (quoting *State v. Pike*, 978 S.W.2d 904, 917 (Tenn. 1998); *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985)). A defendant's actions in causing the victim to fear death or physical harm is a factor in whether the defendant created the severe mental pain or anguish relevant to a finding of torture. *State v. Jordan*, 325 S.W.3d 1, 68 (Tenn. 2010).

The evidence presented at trial established that Appellant bound and beat Mr. James to the point that ten of his ribs were fractured. Dr. Smith testified these fractures occurred while Mr. James was still alive. Mr. James was strangled, and his hyoid bone and sixth cervical vertebra were fractured. He was also stabbed and received multiple incisions to his neck.

Appellant pushed Mrs. James into different rooms in the house, yelled at her, threw her on the floor, threatened her, and bound her. Mrs. James was strangled and cut multiples times across her neck with a knife. The incisions were so deep that the knife cut to the bone. We conclude this evidence is sufficient to establish the heinous, atrocious, or cruel aggravating circumstance with regard to the murders of both victims.

## (i)(6): Murder to Avoid Apprehension

The jury also found Appellant murdered the victims "for the purpose of avoiding, interfering with, or preventing [his] lawful arrest or prosecution." *See* T.C.A. § 39-13-204(i)(6). This aggravating circumstance "focuses on a defendant's motives in committing a murder." *State v. Reid*, 164 S.W.3d 286, 315 (Tenn. 2005). While it need not be the sole motive in committing the murder, "there must be some 'particular proof' that Defendant murdered the victim at least in part to avoid apprehension." *Jordan*, 325 S.W.3d at 72 (quoting *State v. Hartman*, 42 S.W.3d 44, 58 (Tenn. 2001).

Mr. Young testified at trial that after he witnessed Appellant kill Mrs. James, he asked Appellant why he had done so and that the Appellant stated Mrs. James had seen his face. Although there was no testimony that Appellant made a similar statement regarding Mr. James, evidence that Appellant made this statement when questioned about killing Mrs. James and similarly threatened Mr. Young if he reported him gives rise to the inference that Appellant killed the victims upon robbing them to ensure that they would not identify him

and that he would avoid detection by law enforcement officers.

### (i)(7): Felony Murder

The jury also found that Appellant knowing committed the murders while he "had a substantial role in committing or attempting to commit . . . robbery." *See* T.C.A. § 39-13-2049(i)(7). The evidence presented at trial established that Appellant killed the victims while robbing them. The evidence is sufficient to support this aggravating circumstance.

### (i)(14): Seventy Years of Age or Older

Finally, the jury found that Mr. James was 70 years of age or older. *See* T.C.A. § 39-13-204(i)(14). Dr. Smith testified Mr. James was 82 years old when he was killed. This evidence is sufficient to support this aggravating circumstance.

### C. Weighing aggravated and mitigating circumstances as to each victim

We next turn to our inquiry of whether a reasonable juror could find beyond a reasonable doubt that the aggravated circumstances proved by the State with respect to the victim's murder outweigh the mitigating circumstances. The proof supporting the aggravating circumstances is set forth above. Mitigating circumstances instructed to the jury included (1) Appellant was an accomplice in the murder committed by another and Appellant's participation was relatively minor; (2) any lingering doubt as to Appellant's guilt; (3) the accomplice in the murder has not been changed with capital murder and will not face a possible sentence of death; (4) Appellant may face a capital murder charge in Florida; (5) Appellant's background and childhood; and (6) any other aspect of Appellant's character or record, or any aspect of the circumstances of the offense favorable to Appellant which is supported by the evidence.

In addition to proving aggravating circumstances, the State adduced evidence contradicting Appellant's mitigation proof. We hold that a rational juror could have concluded that the four aggravating circumstances proved by the State regarding the first degree murder of Mrs. James outweighed the mitigating circumstances. We also hold that a rational juror could have concluded that the five aggravating circumstances proved by the State regarding the first degree murder of Mr. James outweighed the mitigating circumstances.

**D. Proportionality Review**

When this Court conducts the proportionality review required by Tennessee Code Annotated section 39-13-206(c)(1)(D), we do not function as a "super jury" that substitutes out judgment for the judgment of the sentencing jury. *See State v. Godsey*, 60 S.W.3d 759, 782 (Tenn. 2001). Rather, we must take a broader perspective than the jurors to determine whether Appellant's death sentence "is disproportionate to the sentences imposed for similar crimes and similar defendants." *State v. Thacker*, 164 S.W.3d 208, 232 (Tenn. 2005) (quoting *State v. Bland*, 958 S.W.2d 651, 664 (Tenn. 1997)). The pool of cases upon which we draw in conducting this analysis are "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment possibility of parole, or death." *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006).

The purpose of our review of other capital cases is not to identify cases that correspond precisely with the particulars of the case being analyzed. *State v. Copeland*, 226 S.W.3d 287, 306 (Tenn. 2007); *Thacker*, 164 S.W.3d at 233. Rather, our task is to "identify and invalidate the aberrant death sentence." *Thacker*, 164 S.W.3d at 233. A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. *Carruthers*, 35 S.W.3d at 569. A death sentence is excessive or disproportionate where "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Thacker*, 164 S.W.3d at 233 (quoting *Bland*, 958 S.W.2d at 668).

This Court uses "the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes." *State v. Copeland*, 226 S.W.3d at 305 (quoting *State v. Davis*, 141 S.W.3d 600, 619-20 (Tenn. 2004)). We examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002).

In conducting this comparison with regard to the nature of the crime, we generally consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*State v. Rimmer*, 250 S.W.3d 12, 35 (Tenn. 2008); *see Rollins*, 188 S.W.3d at 575. We also compare the defendant's "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Rimmer*, 250 S.W.3d at 35; *Rollins*, 188 S.W.3d at 575.

In this case, the proof established that in August 2003, Appellant and Mr. Young traveled from Florida to Bartlett, Tennessee. Appellant told Mr. Young that they were going to visit his relatives. Appellant parked his car at an apartment complex, and he and Mr. Young walked to the victims' house where Appellant struck up a seemingly friendly conversation with Mr. James in his yard. While Mr. Young was returning Mr. James' lawn mower to a shed in the back yard, Appellant and Mr. James went inside the house.

Appellant bound Mr. James and beat him fracturing multiple ribs. He also strangled Mr. James to the point that he fractured his hyoid bone and sixth cervical vertebra. Using a knife, Appellant stabbed him and cut him across the neck multiple times. Appellant then bound Mrs. James, pushed her, threw her on the floor, threatened her, and demanded her purse. Once he located her purse, he removed the bindings, strangled her, and cut her across the neck multiple times. When Mr. Young questioned Appellant regarding why he had killed Mrs. James, he said she had seen his face.

Appellant attempted to clean the scene removing evidence, as well as credit cards, cash, and jewelry. He threw evidence from the scene out of his car window as he drove away. Appellant and Mr. Young went to a mall where they purchased clothing and shoes with proceeds from with robbery. They changed clothes and discarded the clothing that they had wore during the robbery and murders. They then fled to Florida. Appellant stopped along the way to purchase gasoline using Mrs. James' credit cards, as well as a Lincoln Towncar.

Appellant was born in Cleveland, Mississippi, and had nine brothers and four sisters. As a child, he lived with his mother and eight of his siblings in a two bedroom house. His older brothers beat him with water hoses and belts, and he saw his brothers burn other siblings with cigarettes. Appellant's father was absent during his childhood, and his mother worked at night leaving Appellant's older brothers to supervise him. Appellant's family later moved to Florida where Appellant began getting into trouble. At age eighteen, Appellant received a thirty-year sentence for various convictions and remained incarcerated for sixteen years until the age of thirty-four. Appellant denied killing the victims but admitted to walking past the victims' house on numerous occasions and seeing them in their yard.

Although no two capital cases and no two defendants are identical, the Tennessee Supreme Court has upheld a sentence of death in cases that share similarities with this case and Appellant. *See State v. Rollins*, 188 S.W.3d 553 (Tenn. 2006) (defendant stabbed eighty-one-year-old victim during a robbery; aggravating circumstances (i)(5), (i)(6), (i)(7), and (i)(14)); *State v. Leach*, 148 S.W.3d 42 (Tenn. 2004) (defendant beat, stabbed, and strangled two elderly women during a robbery; aggravating circumstances (i)(2), (i)(5), (i)(7), and (i)(14)); *State v. Bane*, 57 S.W.3d 411 (Tenn. 2001) (defendant and companions robbed and murdered elderly man during robbery by strangling and asphyxiating him; aggravating circumstances (i)(5) and (i)(6)); *State v. Sims*, 45 S.W.3d 1 (Tenn. 2001) (defendant shot victim during burglary; aggravating circumstances (i)(2), (i)(5), (i)(6), and (i)(7)); *State v. Bush*, 942 S.W.2d 489 (Tenn. 1997) (defendant repeatedly stabbed seventy-nine-year-old woman to death during a burglary; aggravating circumstances (i)(5) and (i)(6)); *State v. Barber*, 753 S.W.2d 659 (Tenn. 1988) (defendant beat elderly woman to death during burglary; aggravating circumstances (i)(5) and (i)(7)); *State v. McNish*, 727 S.W.2d 490 (Tenn. 1987) (defendant bludgeoned seventy-year-old victim to death during a robbery; aggravating circumstance (i)(5)); *State v. Campbell*, 664 S.W.2d 281 (Tenn. 1984) (defendant beat seventy-two-year-old victim to death during robbery; aggravating circumstances (i)(2), (i)(5), and (i)(7)); *State v. Barnes*, 703 S.W.2d 611 (Tenn. 1983) (defendant and companion beat elderly woman during burglary of her home and victim died to pneumonia resulting from beating; aggravating circumstances (i)(2), (i)(5), and (i)(7));*State v. Strouth*, 620 S.W.2d 467 (Tenn. 1981), and *State v. Dicks*, 615 S.W.2d 126 (Tenn. 1981) (companion cases in which defendants received death penalty when elderly store owner's throat was cut during robbery; aggravating circumstances for both were (i)(5) and (i)(7)).[3]  Based upon our review of the entire record in ths case and our review of these and other cases in which the death penalty was imposed and upheld, we conclude that the death penalties imposed in this case for Appellant's brutal murders of Mr. and Mrs. James are not disproportionate to the penalty imposed for similar crimes.

## VI.  MERGER

Although not raised by either party on appeal, we must address Appellant's dual convictions of first degree premeditated murder and felony murder as charged in counts one and three of the indictment with regard to the death of Mr. James and counts two and four of the indictment with regard to the death of Mrs. James.  Our law provides for the "merger

---

[3] We note only one similar case in which the State sought the death penalty but the jury declined to impose it. *See State v. Frank Edward Whitmore*, No. 03C01-9404-CR-00141, 1997 WL 334904 (Tenn. Crim. App., at Knoxville, June 19, 1997), perm. to appeal denied (Tenn. Jan. 4, 1999) (defendant stabbed eighty-year-old victim during a robbery; jury found no aggravating circumstances and imposed a life sentence; mitigating circumstances were minor participation in offense and defendant's youth).

of multiple convictions of first degree murder involving a single victim." *State v. Kiser*, 284 S.W.3d 227, 234 (Tenn. 2009). The trial court, however, entered separate judgments of conviction for each murder offense of each victim. Therefore, we must remand for the entry of appropriate judgments reflecting the merger of Appellant's conviction of felony murder of Mr. James into his conviction of first degree premeditated murder of Mr. James for a single judgment of conviction and the merger of Appellant's conviction of felony murder of Mrs. James into his conviction of first degree premeditated murder of Mrs. James for a single judgment of conviction.

## CONCLUSION

After review of the record and applicable law, we affirm Appellant's convictions and sentences of death and remand this matter to the trial court for entry of a single judgment of conviction for first degree murder with regard to each victim.

 

 

_____
JERRY L. SMITH, JUDGE